J. Christopher Jensen (jcj@cll.com)
Jonathan Z. King (jzk@cll.com)
Eric J. Shimanoff (ejs@cll.com)
COWAN, LIEBOWITZ & LATMAN, P.C.
1133 Avenue Of The Americas
New York, New York  10036-6799
(212) 790-9200
Attorneys for Plaintiff
ATLANTIS INFORMATION TECHNOLOGY, GmbH

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

| | |
|---|---|
| ATLANTIS INFORMATION TECHNOLOGY, GmbH<br><br>                       Plaintiff,<br><br>  -against-<br><br>CA, INC.<br><br>                       Defendant. | Civil Action No.<br>06-CV-3921(JS)(WDW)<br><br>**PLAINTIFF'S RULE 56.1 STATEMENT IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY ON PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT** |

---------------------------------------------------------------- x

Pursuant to Local Civil Rule 56.1, Plaintiff Atlantis Information Technology, GmbH ("Plaintiff" or "Atlantis") respectfully submits this statement of undisputed material facts in support of its motion for partial summary judgment on Plaintiff's claim for breach of contract against Defendant CA, Inc. ("Defendant" or "CA").

THE PARTIES

1.     Atlantis is a corporation organized under the laws of the Federal Republic of Germany, with its principal place of business in Wangen, Germany.  Declaration of J. Christopher Jensen in Support of Plaintiff's Motion for Partial Summary Judgment on Plaintiff's Claim for Breach of Contract, dated November 12, 2010 ("Jensen Decl.") Exhs. A [Plaintiff's

Amended Complaint dated August 21, 2006 ("Complaint") ¶ 7 ] & B [CA's Amended Answer to Amended Complaint and Counterclaims, dated July 13, 2009 ("Answer") ¶ 7].

2. Atlantis has developed, licensed, maintained and supported a line of computer software programs sold under the name Endevor for Natural or "E/NAT" that run only on large mainframe computers (the "E/NAT Products"). Id. Exhs. A [Complaint ¶ 11] & B [Answer ¶ 11].

3. Defendant CA, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Islandia, New York. Id. Exhs. A [Complaint ¶ 8] & B [Answer ¶ 8].

4. As part of its business, CA licenses software from third party developers such as Atlantis, and then sublicenses and distributes such software to its customers. Id.

5. According to its website, CA is one of the world's largest providers of management software, with approximately 13,200 employees worldwide and over $4.27 billion in revenue in fiscal year 2009. Id. Exh. C [CA's website located at http://www.ca.com].

## THE E/NAT SOFTWARE PROGRAM

6. The E/NAT products are software programs that provide an interface between a CA software product called Endevor and NATURAL/PREDICT software products made by a German company called Software AG. Declaration of Alexander Gaugler in Support of Plaintiff's Motion for Partial Summary Judgment on Plaintiff's Claim for Breach of Contract, dated September 2, 2010 ("Gaugler Decl.") ¶ 4; Jensen Decl. Exhs. A [Complaint ¶ 11] & B [Answer ¶ 11].

7. Endevor is a mainframe computer software program that is licensed by CA to its customers. Endevor is a software change manager program that is used to automate and control

an organization's software development process.  Jensen Decl. Exh. C [CA's website located at http://www.ca.com].  The E/NAT interface integrates the operation of the CA Endevor product with the operation of NATURAL (a programming language and software development environment) and PREDICT (a data dictionary), software products distributed by Software AG.  Gaugler Decl. ¶ 4.

8. Atlantis developed the first E/NAT products in approximately 1993 in response to a request from one of its customers for a software solution that would allow the NATURAL and PREDICT software to be integrated into Endevor.  Id. ¶ 5.  By 1996, Atlantis had successfully developed the E/NAT software programs for general distribution to customers who were seeking to integrate the CA Endevor product with their NATURAL and PREDICT products.  Id. ¶ 6.

9. Until approximately June of 2007, when CA first made available its own replacement for E/NAT, E/NAT was the only commercially available software program that provided an interface between Endevor and NATURAL.  Id. ¶ 7; Jensen Decl. Exh. D [Deposition of John Dueckman, taken July 29, 2008 ("Dueckman Dep.") pp. 70-72].

10. Atlantis owns the copyright in the E/NAT products in the United States and worldwide.  Gaugler Decl. ¶ 8.

### THE SOFTWARE LICENSE AGREEMENT

11. In late 1996 and early 1997, CA and Atlantis negotiated a license that would permit CA to sublicense the E/NAT products to CA's Endevor customers worldwide.  Jensen Decl. Exhs. A [Complaint ¶¶ 16-17] & B [Answer ¶¶ 16-17].

12. Thereafter, Atlantis and CA entered into a Software License Agreement (the "SLA") dated as of February 28, 1997 pursuant to which Atlantis granted CA a license to use, market, distribute and sublicense the E/NAT products throughout the world.  Gaugler Decl. ¶ 9

& Exh. A [Px 2[1]].

  13. The SLA provides, inter alia, that:

    (a) The Supplier is Atlantis. Id. Exh. A [Px 2 (A 21190)].

    (b) The Product is E/NAT. Id. [Px 2, Exh. A, ¶1].

    (c) The Territory is worldwide. Id. [Px 2, ¶1].

    (d) "Supplier appoints CA as a non-exclusive distributor with rights to use, market, distribute and sublicense the product [E/NAT] in the Territory in accordance with the terms and conditions of this Agreement." Id. [Px 2, ¶2.1].

    (e) Supplier hereby grants to CA the non-exclusive license "to distribute and sub-license the Product directly and indirectly through Distributors to Customers subject to its then current standard agreements in consideration for royalties paid to Supplier as set forth below…." Id. [Px 2, ¶2.2(b)].

    (f) CA shall pay Supplier a per copy royalty for copies of the Product licensed by CA or its Distributors to Customers under the terms of this Agreement. Id. [Px 2, ¶5.1].

    (g) CA shall report revenues received from the licensing and maintenance of the Product on a quarterly basis within 45 days of the end of each calendar quarter. Id. [Px 2, ¶5.3]

  14. Exhibit B to the SLA supplements the SLA by setting forth the Commercial Terms (the "SLA Commercial Terms"). Id. [Px2, Exh. B].

  15. Paragraph 1 of the SLA Commercial Terms entitled "Royalties" provides, inter alia, the following:

    (a) For each copy of the Product distributed by CA to Customers, CA shall pay a royalty equal to forty percent (40%) of the Net License Fees revenues received by CA from the licensing of the Products by CA to Customers or Distributors and fifty percent (50%) of the Net Maintenance Fee revenues. Id. [Px 2, Exh. B, ¶1(a)].

    (b) CA can establish its selling prices for the Product and will use the same CPU tiers and classifications as CA uses for its own software

---

[1] References to Plaintiff's Deposition Exhibits will be Px ___. References to Defendant's Deposition Exhibits will be Dx ___.

programs.  <u>Id</u>.

(c) "Net License Fees" means the aggregate license fee revenues (including year 1 maintenance service if bundled with the initial license price) collected by CA during each fiscal quarter pursuant to license agreements respecting the Product.  <u>Id</u>.

(d) "Net Maintenance Fees" means the aggregate maintenance renewal revenues collected by CA during each CA fiscal quarter pursuant to license agreements respecting the Product but shall not include amounts collected by CA for initial license fees (and year 1 maintenance if bundled with the license fee).  <u>Id</u>.

16. Paragraph 1(b) of the SLA Commercial Terms, entitled "Bundled Product Sales," provides the following:

> If the Product is licensed or leased with other hardware or software products priced together or sold as a single unit or as a part of a combined lease or license of the Product with such other products (a "Bundled Product Sale"), then the Net License Fee and Net Maintenance Fee amounts arising from such Bundled Product Sales will be the pro-rata amount attributable to the Product, with such allocation being based on CA's standard list prices for each of the products included in the Bundled Product Sale in question (i.e. a greater discount will not be applied to the Supplier Products than to the bundled CA software products included in the same sale).

<u>Id</u>. [Px 2, ¶1(b)].

17. Paragraph 1(c) of the SLA Commercial Terms provides the following:

> CA will use reasonable efforts to ensure that it does not offer discounts in excess of thirty percent (30%) from Suppliers' then prevailing list prices for the Products without first consulting with Supplier; provided the parties agree that this will not apply in the event of price differences resulting from the use of CA's CPU tier classifications as provided above. Supplier agrees not to increase its list prices more than once per annum and agrees to give CA at least 60 days notice prior notice of any price increases.  For purposes of this Section, the prices advised by Supplier to CA shall not be less favorable than the Product prices then quoted to any other Supplier reseller, distributor or direct customer.

<u>Id</u>. [Px 2, ¶1(c)].

18. At the time of the execution of the SLA in February, 1997, the CA list price for

E/NAT was consistent with the Atlantis list price for the program. Id. ¶ 14; Jensen Decl. Exh. E [Deposition of Edwin Ross, taken April 1, 2008 ("Ross Dep.") p. 49].

19. CA established a baselist price for E/NAT of $⬛ in 1997. This list price was increased by CA on August 24, 1999 to $⬛ and on January 1, 2007 to $⬛. Jensen Decl. Exh. F [Px 96 (CA 34148 – CA 34149)]. This base list price was for the license of E/NAT on a CPU in Group or Tier DD. Gaugler Decl. ¶ 15; Jensen Decl. Exhs. G [Px 83 (CA 47090, CA 47139)] & H [Px 19].

20. CA's employee Edward Ross negotiated the SLA with the Managing Director of Atlantis, Alexander Gaugler. During the course of these negotiations, Mr. Ross informed Mr. Gaugler in a letter dated February 11, 1997 that "[Atlantis] product will be licensed for a single, specific CPU." Id. Exhs. E [Ross Dep. pp. 95-96] & I [Px 86 (A 285)].

21. After the execution of the SLA in February, 1997, CA distributed and sublicensed the E/NAT program to its customers under the product code "Endevor for MVS Natural Interface ENDVNA00200." Id. Exh. G [Px 83 (CA 47139)].

## THE CA PRODUCT PRICING HANDBOOK

22. CA maintained a Product Pricing Handbook dated October 1997 (the 1997 CA Product Pricing Handbook) that provided, inter alia, the following:

> (a) "This Computer Associates Pricing Handbook describes the prices and terms for our products and is valid for all clients and computer installations located in the USA." Id. [Px 83 (CA 47079)].
>
> (b) "Section 3 consists of the CA Product List—and alphabetic listing of most CA software products…. You can find a product's unique Product Code, Base License Fee, the percentage rate used in calculating usage and maintenance fees and other information needed to calculate fees for the product." Id. [Px 83 (CA 47083)].
>
> (c) Section 3 of the Computer Associates Pricing Handbook lists the CA Software Base License Fees and lists E/NAT (ENDVNA 00200) as one of the CA products with a base CPU License Fee of

$▓▓▓▓. Id. [Px 83 (CA 47139)].

23. The 1997 CA Product Pricing Handbook provided, inter alia, that: "CA's software products are not sold but rather made available to our clients under license agreements that specify the rights and obligations of each party. Software products covered by a valid CA License Agreement are generally referred to in this Handbook as Licensed Programs. Licensed Programs are ordinarily licensed for use in a specific computing environment, at a specific installation site, by a particular licensee and for its internal purposes to process its own data and not that of any other person or entity." Id. [Px 83 (CA 47086)].

24. The 1997 CA Product Pricing Handbook further provided, inter alia, that:

    (a) "CA's standard license is a G1 designated-CPU license. 'G1' refers to CA's standard payment option, described below. For certain products, CA may also provide other licensing options. For example, MIPS based licenses are typically available for clients licensing an array of CA mainframe products who want great flexibility in deploying them."

    (b) "**Designated CPU** Under a typical CA designated-CPU license, the client may use the Licensed Program on a single, designated CPU identified on a CA Order Form by manufacturer, model and serial number. The license fee for a designated-CPU license typically reflects the processing power of the designated CPU, but CPU licenses may also be available on a non-tiered basis."

    (c) "**MIPS Base License** Such a license allows the client to use the Licensed Program on one or more CPUs, limited by the aggregate power rating of the CPUs covered by the license. Use of the Licensed Program is ordinarily limited to the named licensee and its majority-owned subsidiaries. The license imposes certain restrictions on movement of the program between sites."

Id.

25. The 1997 CA Product Pricing Handbook further provided, inter alia, that: "**The G1 License:** Under CA's standard payment option, known as a G1, the client pays a one-time or initial license fee, which includes maintenance and the right to use the Licensed Program for one

year. To continue using a Licensed Program and receive maintenance and enhancement services after that first year, the client must pay an annual usage and maintenance fee ("UMF"). Id. [Px 83 (CA 47087)].

26. Later revisions of the CA Product Pricing Handbook contain substantially similar language to the language quoted in paragraphs 25 and 26 above except that the "G1" designation for the standard payment option is changed to "O1." Id. Exh. J [CA 47265 – CA 47273, CA 47455 – CA 47464].

THE SECOND AMENDMENT TO THE SOFTWARE LICENSE AGREEMENT

27. Atlantis and CA executed an Amendment Number Two to the SLA dated and effective as of July 9, 1998 ("the Second Amendment"). Gaugler Decl. ¶ 16 & Exh. B [Dx 19].

28. The Second Amendment provided, inter alia, that Exhibit B entitled "Commercial Terms" of the SLA would be amended by deleting Subsection 1(a) and replacing it with, inter alia, the following:

> (a) "Royalties. For each copy of the Product distributed by CA to Customers, CA shall pay an "Initial License Fee" which is defined as an amount equal to thirty-four percent (34%) of the 'G1' list price for licensing and maintenance during the Initial License Period (as defined below) for each license agreement respecting the Product. Such fees shall be payable by CA as CA receives licensing and maintenance fees from its licensees during the course of the Initial License Period. Subsequent to such Initial License Period, CA shall pay fifty percent (50%) of the aggregate maintenance renewal revenues collected by CA during each fiscal quarter pursuant to license agreements respecting the Product, but shall not include amounts collected by CA covered by the Initial License Fee (as described above), consulting fees, taxes, handling charges, sales of reference materials and supplies or licenses to other computer software programs licensed with such Product."

Id. ¶ 17 & Exh. B [Dx 19 (CA 7180)].

29. The Second Amendment further provided that:

> (b) "At the end of that Subsection 1(a), the following is added: Notwithstanding the reporting requirements contained in Section 5.3 of the Agreement, for each

>   Product royalty payable hereunder, CA shall report CPU type and length of license term. The maintenance fee (i.e. fee after the Initial License Period) shall not be less than 13% of the "G1" list price. The "G1" list price means the one time fee paid by a licensee inclusive of usage and maintenance for a one year period (as provided in CA's then standard "Order Form")."

Id. ¶ 18 & Exh. B [Dx 19 (CA 7181)].

30. CA's then standard Order Form defined "G1" as:

>   A one-time fee ("OTF") inclusive of usage and maintenance for a one-year period. Thereafter, continued usage of the Licensed Program and maintenance will be subject to an annual usage and maintenance fee ("UMF") equal to the then prevailing OTF for the Licensed Program multiplied by the then prevailing UMF rate for the Licensed Program.

Id. ¶ 19 & Exh. I [Px 11 (CA 4186 – CA 4187)].

31. The Order Form further provided under the heading "Additional CPU(s)":

>   Additional CPU(s) at the same installation site may be licensed to use the Licensed Program. In order to add one or more CPU(s), one copy of the Licensed Program at the installation site must either have an existing license to run on a CPU in the highest CPU group at the installation site, or be upgraded to a CPU in that highest CPU group in accordance with the "Upgrade" policy of CA. The license for additional CPU(s) may be an Option G1, G2, A0 or A8 only if the license for the Licensed Program in the highest CPU group shall be an Option G1, G2, A0 or A8. Provided that the first CPU has been upgraded to or is licensed for use in the highest CPU group at the installation site, the license fee, and any subsequent UMF, for each additional CPU at the same installation site shall be the then prevailing license fee or UMF, as the case may be, applicable to the additional CPU. In all cases, such additional CPU license fee or UMF shall only apply during such time as the Order and UMF for the Licensed Program in the highest CPU group shall be current and in effect.

Id. ¶ 20 & Exh. I [Px 11 (CA 4187)].

32. The Second Amendment deleted in its entirety the first sentence of Section (1)(c) of Exhibit B of the SLA entitled "Commercial Terms," which had provided "CA will use reasonable efforts to ensure that it does not offer discounts in excess of thirty percent (30%) from Suppliers' then prevailing list prices for the Products without first consulting with Supplier; provided the parties agree that this will not apply in the event of price differences resulting from

the use of CA's CPU tier classifications as provided above." Id. ¶ 21 & Exh. B [Dx 19 (CA 7181)].

33. Following the Second Amendment, CA instructed its royalty department in a Summary of How to Calculate Royalties that "Per the amendment dated 7/98, royalties are to be calculated as follows: 'Initial License Fee is defined as an amount equal to 34% of the G1 list price for licensing and mntence [sic] during the initial license period.'" Jensen Decl. Exh. H [Px 19 (CA 34033)].

34. The CA Summary of How to Calculate Royalties further provided that: "New Deals:

> - Initial License Fee: Pay G1 List price: Base price x cpu tier x 34% (for year 1 of Initial License Period).
>
> - Initial Period Lic - Mntnce: Base price x cpu tier x 13% (mntnce rate) x 34% (each year after the yr 1 for the remaining yrs of Initial License Period).
>
> -Mntnce: Pay 50% of revenue collected for mntance (not less than 13% mntnce) after Initial License Period-when agreement starts to bill mntnce."

Id.

35. The CA Summary of How to Calculate Royalties also provided: "Per Jim McGarry, For Entrp and Foundations, pay only on one site not on every site in the deal and pay at the highest cpu (check all sites in agmt for highest cpu)." Id.

36. Mr. Gaugler negotiated the Second Amendment with CA's employee Mr. James McGarry, who was designated as CA's Rule 30(b)(6) witness on the subject of the Second Amendment. When asked at his deposition to identify any provision in either the original SLA or the Second Amendment that authorized CA to pay royalties to Atlantis based on "only one site" and only on "the highest CPU," Mr. McGarry testified, "I don't see language in the Second Amendment or the base agreement that calls for that." Id. Exhs. K [Deposition of James

McGarry, taken February 21, 2008 ("McGarry Dep.") pp. 163-67] & H [Px 19].

37.     Following the Second Amendment, CA continued to prepare quarterly royalty statements that were sent to Atlantis and continued to pay the royalties shown as being due to Atlantis on the quarterly royalty statements.  Gaugler Decl. ¶ 23;  Jensen Decl. Exhs. L [Deposition of Linda Betances, taken September 11, 2008 ("Betances Dep.") pp. 16, 40] & M [Px 142].

38.     The CA royalty reports issued to Atlantis each quarter from September, 1998 following the execution of the Second Amendment until the execution of the Settlement Agreement in December, 2004 contained entries showing the following information about CA licenses of the E/NAT software programs to its customers: the Country, the customer's Company Name, the CA invoice number to the customer, whether the payment is for a license ("L"), or maintenance ("L-M"), the model number of the CPU licensed, the length of the Initial License Period, the Invoice or credit date, the total G1 List Price, the License royalty rate (34%), the Maintenance Royalty Rate, the earned royalty, the payment date, the current royalty payable to Atlantis and any royalty previously paid.  Id. Exh. S.

39.     The CA royalty reports from quarter ending September 1998 to December 2004 did not contain any information that would indicate whether the CA license to its customer was a MIPS license.  Id. Exh. S.

40.     During the period from September 1998 to September 2004, CA reported the license of E/NAT for only one CPU for each customer and paid royalties for a license fee or maintenance fee for only one CPU for each customer.  Id. Exh. L [Betances Dep. pp. 53-55, 97, 106-107].

41.     During the period from September 1998 until April 2005, CA never reported to

Atlantis that it was licensing the E/NAT program to any customer for use on multiple CPUs or for use on an unspecified number of CPUs subject to a total MIPS capacity limitation. Id. Exhs. L [Betances Dep. pp. 70-75, 82-84] & N [Deposition of Marni DeMeyer, taken April 16, 2008 ("DeMeyer Dep.") p. 91].

42. During the period from September 1998 until September 2004, while the Second Amendment was in effect, CA did not perform any allocation of the Net License Fees or Net Maintenance Fees received by CA from the licensing of E/NAT to its customers or otherwise apply the provisions of paragraph 1(b) of the SLA ("Bundled Product Sales") to determine the amount of royalties to be paid to Atlantis. Id. Exhs. N [DeMeyer Dep. pp. 89-90], L [Betances Dep. pp. 146-148] & O [Deposition of John Ball, taken March 4, 2008 ("Ball Dep.") p. 197].

43. During the period from September 1998 until September 2004, while the Second Amendment was in effect, CA did not perform any allocation of the MIPS licensed to its customers in determining the amount of royalties to be paid to Atlantis. Id.

THE SETTLEMENT AGREEMENT AND THIRD AMENDMENT TO THE SLA

44. In November 2003, CA and Atlantis began to have discussions about revising the Software License Agreement. Gaugler Decl. ¶ 24; Jensen Decl. Exh. O [Ball Dep. pp. 81-82].

45. In 2004, as the result of various disputes between CA and Atlantis regarding the royalties to be paid to Atlantis, CA and Atlantis entered into negotiations of a Settlement Agreement and a Third Amendment of the SLA. Gaugler Decl. ¶ 25; Jensen Decl. Exhs. O [Ball Dep. pp. 158-161], P [Deposition of Alexander Arato, taken March 13, 2008 ("Arato Dep.") p. 45]; Q [Px 46] & R [Px 47].

46. Atlantis and CA simultaneously executed a Settlement Agreement dated and effective as of December 10, 2004 and a Third Amendment to the SLA ("the Third

Atlantis that it was licensing the E/NAT program to any customer for use on multiple CPUs or for use on an unspecified number of CPUs subject to a total MIPS capacity limitation. Id. Exhs. L [Betances Dep. pp. 70-75, 82-84] & N [Deposition of Marni DeMeyer, taken April 16, 2008 ("DeMeyer Dep.") p. 91].

42. During the period from September 1998 until September 2004, while the Second Amendment was in effect, CA did not perform any allocation of the Net License Fees or Net Maintenance Fees received by CA from the licensing of E/NAT to its customers or otherwise apply the provisions of paragraph 1(b) of the SLA ("Bundled Product Sales") to determine the amount of royalties to be paid to Atlantis. Id. Exhs. N [DeMeyer Dep. pp. 89-90], L [Betances Dep. pp. 146-148] & O [Deposition of John Ball, taken March 4, 2008 ("Ball Dep.") p. 197].

43. During the period from September 1998 until September 2004, while the Second Amendment was in effect, CA did not perform any allocation of the MIPS licensed to its customers in determining the amount of royalties to be paid to Atlantis. Id.

THE SETTLEMENT AGREEMENT AND THIRD AMENDMENT TO THE SLA

44. In November 2003, CA and Atlantis began to have discussions about revising the Software License Agreement. Gaugler Decl. ¶ 24; Jensen Decl. Exh. O [Ball Dep. pp. 81-82].

45. In 2004, as the result of various disputes between CA and Atlantis regarding the royalties to be paid to Atlantis, CA and Atlantis entered into negotiations of a Settlement Agreement and a Third Amendment of the SLA. Gaugler Decl. ¶ 25; Jensen Decl. Exhs. O [Ball Dep. pp. 158-161], P [Deposition of Alexander Arato, taken March 13, 2008 ("Arato Dep.") p. 45]; Q [Px 46] & R [Px 47].

46. Atlantis and CA simultaneously executed a Settlement Agreement dated and effective as of December 10, 2004 and a Third Amendment to the SLA ("the Third

Amendment"). Gaugler Decl. ¶ 26 & Exhs. C [Dx 26] & D [Dx 27].

47. The Settlement Agreement provided for the settlement of the parties' disputes arising from or relating to the SLA and an earlier concession of rights agreement between Atlantis and CA executed in January, 1996 in consideration of CA's payment to Atlantis of the sum of ███████████████████████████████. Id. ¶ 27 & Exh. C [Dx 26 (CA 7056 – CA 7057)].

48. The Settlement Agreement provided for a mutual general release of any claims between the parties subject to the exception, inter alia, that "Atlantis does not release CA and its subsidiaries, affiliates, predecessors, successors, agents, assignees, and representatives from any claims, obligations or liabilities relating to any royalties due Atlantis for: (A) any licensees and/or installations of the Products that have not been disclosed on any royalty report prepared by CA and delivered to Atlantis prior to June 30th, 2004." Id. ¶ 28 & Exh. C [Dx 26 (CA 7057)].

49. The release in the Settlement Agreement also excepted certain royalties that might be due for previously undisclosed test installations of E/NAT and for any amounts due to Atlantis from June 30, 2004 until the date of the release. Id. ¶ 29 & Exh. C.

50. The Third Amendment provided, inter alia, that:

> "Any and all royalty payment terms of the Agreement, in particular, without limitation, Exhibit B of the Agreement, "Commercial Terms," shall be amended to the following effect:
>
> Royalties. For each copy of the Product distributed by CA to its customers, CA shall pay to Atlantis an amount equal to thirty-four percent (34%) of the "G1" list price, which fee shall be inclusive of maintenance for the first one (1) year period after the delivery of the Product from CA to CA's customer.
>
> Subsequent to the first one (1) year period, CA shall pay an amount of 50% of 15% of the "G1" list price, as support and maintenance fees."

Id. ¶ 30 & Exh. D [Dx 27 (CA 688)].

51.     The Third Amendment further provided that:

> **"G1'' list price.**  The "G1" list price means the one time fee to be paid by licensee as license and maintenance fees for a one (1) year period.  The current "G1" list prices are set out in Table 1.  CA shall not be entitled to modify the "G1" list price without the prior written consent of Atlantis, which consent shall not be unreasonably withheld."

Id. ¶ 31 & Exh. D [Dx 27 (CA 688)].

52.     The Third Amendment further provided that:

> "**Discounts to the "G1" list price regarding license and maintenance fees for the first one (1) year period.**  CA shall be entitled to grant discounts to CA's customers regarding the license and maintenance fees for the first one (1) year period.  CA's obligation to pay to Atlantis the amount of thirty-four (34%) percent of the "G1" list price as royalties on the license and maintenance fees for the first one (1) year period shall remain untouched, regardless of the amount of the percentage discount to the "G1" list price granted by CA to CA's customers.

Id. ¶ 32 & Exh. D [Dx 27 (CA 688)].

53.     The Third Amendment contains a Table 1 for the "G1" list prices for E/NAT as of July 1st 2004 that sets forth the Group/Class of the licensed CPU, the maximum MIPS rate or capacity for each Group or Class of CPU, and the "G1" list price for E/NAT in U.S. dollars for each Group or Class of CPU.  In the case of a Group/Class CPU of 110 with a MIPS rating of more than 400 MIPS (the largest CPU Group/Class in the Table), there is an indication that the "G1" list price is "to be agreed."  Id. ¶ 33 & Exh. D [Dx 27 (CA 689)].

54.     The Third Amendment further provided that:

> In case a client uses the software on more than one (1) MACHINE, the following rules shall be applied:
>
> 1.      The largest MACHINE on which the software is installed shall be used to calculate the basic fees (with 34%) royalty.
>
> 2.      For each additional MACHINE the additional royalties shall be of 20% (instead of 34%) of the "G1" list price.

>"MACHINE" is defined as one (1) hardware box.  LPARS or other logical parts are not considered to be "MACHINEs", the MACHINE classes are defined in Table 1.

Id. ¶ 34 & Exh. D [Dx 27 (CA 689)].

55. The Third Amendment sets forth in Table 2 two examples of how the royalties due for License and Maintenance fees for the first one year period and the support and maintenance fees subsequent to the first one year period would be calculated on a Group 60 and a Group 80 machine.  Id. ¶ 35 & Exh. D [Dx 27 (CA 689 – CA 690)].

56. The Third Amendment contains a Table 3 listing all of the items of information that are to be contained in the records and royalty reports given to Atlantis for each licensed installation to a CA customer.  Id. ¶ 36 & Exh. D [Dx 27 (CA 690)].

57. Among other things, Table 3 states that the number of CPUs licensed to a customer and the CPU number, manufacturer and model or type are to be disclosed to Atlantis. Id. ¶ 37 & Exh. D [Dx 27 (CA 690)].

58. Paragraph 5 of the Settlement Agreement further provided that CA would provide Atlantis with a Royalty Report containing the information set forth in Table 3 of the Third Amendment.  Id. ¶ 38 & Exh. C [Dx 26 (CA 7057 – CA 7058)].

59. CA has not provided Atlantis with all of the information set forth in Table 3 of the Third Amendment on royalty reports sent to Atlantis after the execution of the Third Amendment.  Id. ¶ 39.

60. The Third Amendment provided for a term to run for "a minimum period of three (3) years, starting with the day of the execution of this Amendment" and that "[a]fterwards, the Amended Agreement shall automatically renew itself and run for an indefinite period of time, unless it is terminated by either party, giving at least six (6) months prior written notice."  Id. ¶ 40 & Exh. D [Dx 27 (CA 691)].

61. On January 15, 2005, CA sent Atlantis a copy of a Royalty Report that was required by the Settlement Agreement. Id. ¶ 41 & Exh. E [Px 107].

62. Although CA's January 15, 2005 Royalty Report did not contain all of the information required by Table 3 of the Third Amendment, it disclosed, inter alia, that CA had licensed E/NAT to some customers for use on multiple CPUs. Id. ¶ 42 & Exh. E [Px 107].

63. A dispute arose between the parties as to whether CA was properly calculating royalties, including whether CA was required to pay Atlantis a royalty on the "G1" list price for each of the customer's CPUs that were licensed to install E/NAT. Id. ¶ 43 & Exhs. F [Dx 29] & G [Dx 30].

64. On April 22, 2005, John Ball of CA wrote to Atlantis's counsel Meinhard Erben regarding Atlantis's objections to CA's calculation of royalties based upon the January 15, 2005 Royalty Report. Id. ¶ 44 & Exh. H [Px 32 (CA 13392 – CA 13397)].

65. In his letter of April 22, 2005, Mr. Ball stated that the CA customers who were identified as having multiple CPU's "were licensing the product on a capacity (MIPS) basis so the number of CPU's is irrelevant." Id. ¶ 45 & Exh. H.

66. Mr. Ball enclosed as Exhibit B to his letter a description of how CA had calculated the royalties payable on a MIPS license. He stated that: "For Class 110 machines, or machines greater than 400 MIPS, we first allocated the # of MIPS the client would be using for Endevor for Natural pursuant to Section 1(b) of Exhibit B of the Software License Agreement" and quoted that Section of Exhibit B to the SLA. Id. ¶ 46 & Exh. H.

67. Section 1(b) of Exhibit B to the SLA expressly provides for the allocation of "Net License Fees" and "Net Maintenance Fees." The term "MIPS" is not used in paragraph 1(b) and there is no statement that CA may allocate the number of "MIPS" licensed by CA to a customer

in determining the royalties payable to Atlantis. Id. ¶ 47 & Exh. A [Px 2 (A 21200)].

68. Mr. Ball's explanation further stated: "Once we arrive at the number of MIPS, we subsequently applied the formula set forth below to calculate the list price. List price is calculated by multiplying the base price by the result of the following formula:

| # of MIPS | Factor |
|---|---|
| <400 | 3.5 |
| 401-800 | 3.5 + (MIPS-400) x 0.008 |
| 801-1200 | 6.7 + (MIPS-800) x 0.0072 |
| >1200 | 9.58 + (MIPS-1200) x 0.0065 |

Id. ¶ 48 & Exh H [Px 32 (CA 13396)].

69. Mr. Ball gave three examples of how this formula should be applied to determine the royalty due to Atlantis. The first example was for the license granted by CA to the ▮▮▮▮ company, who had licensed all products in their enterprise for 21,050 MIPS. Mr. Ball stated that "Based on a list price allocation across all products, the allocated number of MIPS related to Endevor for Natural is .1984% or 42 MIPS. At less than 400 MIPS, the factor is 3.5." Using a factor of 3.5, he calculated a list price of $▮▮▮▮ (i.e. 3.5 x the then base price of $▮▮▮▮ for E/NAT). He then calculated the maintenance royalty due to Atlantis by multiplying this "list price" by 50% of the agreed upon 15% maintenance rate to arrive at a royalty of $▮▮▮▮ due to Atlantis. Id. ¶ 49 & Exh. H [Px 32 (CA 13397)].

70. In his second example, Mr. Ball calculated the royalty due on CA's license to the ▮▮▮▮ company of E/NAT for a CPU with a MIPS rating of 606. Because the MIPS

-17-

rating of this machine exceeded 400 MIPS, he applied the formula in his table set forth in paragraph 66 above which resulted in a maintenance royalty payable to Atlantis of $ ▇▇▇▇. Id. ¶ 50 & Exh. H [Px 32].

71.     In his third example, involving CA's license to its customer ▇▇▇▇▇▇▇ ▇▇▇▇▇, the license for all products in their enterprise was for 645 MIPS. Based on his list price allocation, he found an allocation percentage of 25.37% resulting in an allocated number of 164 MIPS. Applying a factor of 3.5, he calculated the maintenance royalty due to Atlantis of $▇▇▇▇▇. Id. ¶ 51 & Exh. H [Px 32].

72.     Mr. Ball's letter of April 22, 2005 was the first notice to Atlantis of CA's calculation of royalties due to Atlantis based upon the allocation of MIPS licensed to a CA customer. Id. ¶ 52 & Exh. H [Px 32]; Jensen Decl. Exh. L [Betances Dep. pp. 148-149, 165-166].

73.     Mr. Ball's letter of April 22, 2005 was the first notice to Atlantis of CA's allocation of MIPS pursuant to the "Bundled Product Sales" provision of section 1(b) of Exhibit B of the Software License Agreement in determining the amount of royalties payable to Atlantis. Gaugler Decl. ¶ 53 & Exh. H [Px 32]; Jensen Decl. Exh. L [Betances Dep. pp. 148-149, 165-166].

74.     From the Second Amendment of the original Software License Agreement in July of 1998, until after the execution of the Settlement Agreement and Third Amendment in December of 2004, CA had not applied the "Bundled Product Sales" provision of section 1(b) of Exhibit B of the Software License Agreement to the calculation of any royalties due to Atlantis. Id. [Betances Dep. pp. 138-139, 148].

75.     CA never calculated royalties due to Atlantis based upon the allocation of MIPS

on any quarterly royalty statement prior to the Royalty Statement sent January 15, 2005.  Id.

76. There is no reference to MIPS licenses in the SLA or any of its amendments. Gaugler Decl. ¶ 54 & Exhs. A [Px 2], B [Dx 19] & D [Dx 27].

77. CA's employee John Ball participated in the negotiations of the Settlement Agreement and Third Amendment with Atlantis.  Mr. Ball was CA's Rule 30(b)(6) designee on the subject of the Third Amendment.  When asked to identify which provision of the parties' agreements supported his view that MIPS could be allocated in this way, he identified the "Bundled Product Sales" provision of section 1(b) of Exhibit B to the SLA.  With respect to this provision, he testified as follows:

> Q. Does the word "MIPS" appear anywhere in that paragraph?
>
> A. No.
>
> Q. Is there anything in that paragraph that says that CA is entitled to allocate the number of MIPS in determining how to pay royalties to Atlantis?
>
> A. No.
>
> Q. Are there any other provisions in this Exhibit 1b that you would refer to as being a basis for your decision on MIPS allocation?
>
> A. No.
>
> Q. Anything in any of the other amendments that you based your decision on?
>
> A. No.
>
> Q. Did you base your decision in any way upon any oral agreements or understandings that you had with Atlantis?
>
> A. I don't recall.
>
> Q. Do you recall whether or not you had any oral agreements with Atlantis that are not reflected in the written agreements?
>
> A. I don't recall.

Jensen Decl. Exh. O [Ball Dep. pp. 95-96].

78. Despite Atlantis' objections, CA continued after January, 2005 to calculate royalties due to Atlantis on MIPS  licenses by first allocating the number of MIPS based upon the relative base price of E/NAT to the total base price of all products licensed by CA to its customer in a bundled sale of products.  Jensen Decl. Exh. L [Betances Dep. pp. 176-179].

Dated: New York, New York  
November 15, 2010

Respectfully submitted,

COWAN, LIEBOWITZ & LATMAN, P.C.

By:      /s/ J. Christopher Jensen          
J. Christopher Jensen (jcj@cll.com)  
Jonathan Z. King (jzk@cll.com)  
Eric J. Shimanoff (ejs@cll.com)  
1133 Avenue Of The Americas  
New York, New York  10036-6799  
(212) 790-9200  
Attorneys for Plaintiff ATLANTIS INFORMATION TECHNOLOGY, GmbH