UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ATLANTIS INFORMATION
TECHNOLOGY, GmbH,

     Plaintiff-Counterclaim Defendant,

        v.

CA, INC.,

     Defendant-Counterclaim Plaintiff.

Civil Action No.
06-CV-3921 (JS) (ETB)

## MEMORANDUM OF LAW IN SUPPORT OF
## CA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael D. Schissel
Pamela A. Miller
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
Tel:  (212) 715-1000
Fax:  (212) 715-1399

John P. McEntee
Kevin P. Mulry
FARRELL FRITZ, P.C.
1320 RXR Plaza
Uniondale, New York  11556
Tel:  (516) 227-0700
Fax:  (516) 227-0777

*Attorneys for CA, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

FACTS ....................................................................................................................... 2

A.   The Parties ...................................................................................................... 2

B.   E/NAT Is a Limited-Use Accessory for CA's Endevor Software ................. 3

C.   CA Licensed E/NAT Bundled with Many Other Products ............................ 5

D.   The Contracts at Issue ................................................................................... 6

ARGUMENT ........................................................................................................... 11

I.   "INSTALLATION" AND "USE" ARE UNAMBIGUOUS AND MEAN
     ACTUAL USE AND ACTUAL INSTALLATION OF E/NAT .................... 11

     A.   "Installation" Is Unambiguous ............................................................ 13

     B.   "Use" Is Unambiguous ......................................................................... 13

II.  ANY AMBIGUITY IN "INSTALLATION" AND "USE" SHOULD BE
     RESOLVED BY THE COURT IN FAVOR OF CA BASED ON THE
     EXTRINSIC EVIDENCE ........................................................................... 14

     A.   Extrinsic Evidence Demonstrates That "Installation" Means Actually Installed ..15

     B.   Extrinsic Evidence Demonstrates That "Use" Means Actually Used by the CA
          Customer ............................................................................................. 15

     C.   Plaintiff's Interpretation Could Not Have Been Contemplated by the Parties
          Because it is So Economically Irrational ............................................. 17

CONCLUSION ........................................................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

<u>Cases:</u>                                                                                      <u>Page(s)</u>

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)................................................................................11

*Bethlehem Steel Co. v. Turner Constr. Co.,*
   2 N.Y.2d 456 (1957) ..............................................................................12

*Collins v. Harrison-Bode,*
   303 F.3d 429 (2d Cir. 2002)...................................................................14

*Compagnie Financiere de Cic et de L'Union Europeenne v. Merrill Lynch, Pierce,*
   *Fenner & Smith Inc.,* 232 F.3d 153 (2d Cir. 2000)..............................14

*Continental Ins. Co. v. Atlantic Cas. Ins. Co.,*
   603 F.3d 169 (2d Cir. 2010) ...........................................................12, 13

*Greenfield v. Philles Records, Inc.,*
   98 N.Y.2d 562 (2002) ......................................................................11-12

*Hamblin v. British Airways PLC,*
   717 F. Supp. 2d 303,
   2010 WL 2423581 (E.D.N.Y. 2010)....................................................11

*Hatalmud v. Spellings,*
   505 F.3d 139 (2d Cir. 2007)...................................................................13

*Hayes v. New York City Dept. of Corrections,*
   84 F.3d 614 (2d Cir. 1996).....................................................................16

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.,*
   889 F.2d 1274 (2d Cir. 1989).................................................................12

*Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.,*
   917 F.2d 100 (2d Cir. 1990)..............................................................12-13

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,*
   595 F.3d 458 (2d Cir. 2010)..............................................................11, 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)...............................................................................11

*Mellon Bank, N.A. v. United Bank Corp. of N.Y.,*
   31 F.3d 113 (2d Cir. 1994).....................................................................14

*Moldofsky v. Moldofsky*
  43 A.D.3d 1011 (2d Dep't 2007) .................................................................................15, 16

*Mortimer v. Otto,*
  206 N.Y. 89 (1912) ................................................................................................17

*Nabisco, Inc. v. Warner-Lambert Co.,*
  220 F.3d 43 (2d Cir. 2000).......................................................................................11

*Nycal Corp. v. Inoco PLC,*
  988 F. Supp. 296 (S.D.N.Y. 1997),
  *aff'd,* 166 F.3d 1201 (2d Cir. 1998) .............................................................................15

*Schonfeld v. Hilliard,*
  218 F.3d 164 (2d Cir. 2000)......................................................................................17

*Shepley v. New Coleman Holdings Inc.,*
  174 F.3d 65 (2d Cir. 1999) .......................................................................................14

*Slamow v. Del Col,*
  79 N.Y.2d 1016 (1992) ...........................................................................................12

*Western World Ins. Co. v. Stack Oil, Inc.,*
  922 F.2d 118 (2d Cir. 1990)......................................................................................11

**Other Authorities:**

Fed. R. Civ. P. 56 ...................................................................................................1, 11

*Microsoft Computer Dictionary* (5th ed. 2002) .................................................................13

*Random House Webster's Unabridged Dictionary* (2d ed. 2001) ............................................13

*American Heritage Dictionary of the English Language* (4th ed. 2009).....................................13

Defendant-Counterclaim Plaintiff CA, Inc. ("CA") respectfully submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment on Plaintiff's claim for breach of contract[1] pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court should grant CA partial summary judgment establishing that the terms "installation" and "use" in the agreements at issue mean actual, and not potential or hypothetical, installation and use.

## PRELIMINARY STATEMENT

During the period 1997 through 2007, CA distributed a computer software product developed by Plaintiff pursuant to a written distribution agreement. Plaintiff's claim in this action is that CA underpaid royalties due under this agreement. That claim, however, is built almost entirely on a wishful and unsupported interpretation of two simple, unambiguous words in the parties' agreements: "installation" and "use." Plaintiff takes the position in this case—contrary to the plain meaning of the words and the testimony of its own witnesses—that the word "installed" means "could have been installed" and the word "use" means "licensed to use."

Relying on these flawed, self-serving interpretations, Plaintiff asserts an extraordinary damages claim of $190 million in unpaid royalties, $130 million of which is attributable to claims Atlantis had already released pursuant to a Settlement Agreement in 2004. Atlantis's damages claim is unmoored from economic reality. Plaintiff's software product, E/NAT, is an accessory product that generated $17.5 million in estimated revenue for CA over ten years, and cost CA only $650,000 to replace. CA has already paid Plaintiff $9.4 million in royalties for this

---

[1]   In the Amended Complaint dated August 21, 2006 (Suppl. Decl. of Michael D. Schissel in Supp. Def. Mot. Partial S.J. dated Nov. 15, 2010 ("Suppl. Decl.") Ex. 1), Plaintiff asserted six claims for relief. All but one of those claims, the First Claim for breach of contract, were dismissed by Order of the Hon. Arthur D. Spatt dated April 30, 2007. See Docket Entry 25.

product, representing more than half the revenues it earned. By any industry standard, Atlantis has already been compensated generously.

Even if the Court were to find ambiguity in the terms "installation" or "use," their commonsense meaning and the extrinsic evidence in no way support Plaintiff's unreal interpretation of those words. The Court should not allow Plaintiff to proceed to trial on claims that rely on the improper re-writing of the parties' agreements. Applying the plain meaning of these unambiguous terms will significantly reduce Plaintiff's alleged damages, narrow the issues and evidence and reduce the length of, and the judicial resources necessary for, trial. Partial summary judgment in favor of CA, declaring that "installation" means actual installation and "use" means actual use, should be granted.

## FACTS

The facts relevant to this motion are set forth below, are based on the discovery record in this case, and are undisputed.

### A.   The Parties

CA is a leading information technology software company that licenses computer software to its customers pursuant to written license agreements. Suppl. Decl. Ex. 2, Expert Report of Christopher Gerardi dated May 8, 2009 ("Gerardi Report"), at 8. Some of that software is owned and developed by CA; other software is licensed from third parties (like Plaintiff here) and redistributed to CA's customers. *Id.*

Atlantis is a German software company founded by Managing Director Alexander Gaugler's wife. Suppl. Decl. Ex. 1, Am. Compl. dated Aug. 21, 2006, at ¶ 7; Ex. 3, Dep. Tr. Alexander Gaugler dated Jan. 24, 2008 ("Gaugler Dep. I") at 17:8-18:3. Atlantis developed and

licensed two software products, one of which, E/NAT, is at issue here. *See* Suppl. Decl. Ex. 3,

Gaugler Dep. I at 30:5-10, 42:17-43:8.

**B.** **E/NAT Is a Limited-Use Accessory for CA's Endevor Software**

CA developed and licenses a product known as CA Endevor Software Change Manager

("Endevor") to businesses and other organizations that develop mainframe applications.  In

laypersons' terms, Endevor acts as a "track changes" tool for software development.  Suppl.

Decl. Ex. 4, Dep. Tr. John Dueckman dated Jul. 29, 2008 ("Dueckman Dep. I") at 50:25-51:10

and Dep. Tr. John Dueckman dated Dec. 17, 2009 ("Dueckman Dep. II") at 30:4-9.

Endevor is designed for use with certain computer programming languages supported by

IBM.  For CA customers who wanted to develop software applications using the non-IBM-

supported language "Natural" (offered by IBM competitor, Software AG), and also use Endevor

to manage the development, Plaintiff's product, E/NAT, served as an interface between CA's

Endevor and the Natural programming language. *See* Suppl. Decl. Ex. 4, Dueckman Dep. I at

47:9-16 and 76:7-18.  E/NAT allowed CA to offer another option to its Endevor product to the

small subset of customers who needed to use Endevor in the less-common Natural language.

Large organizations may have several, in some cases dozens, of mainframe computers to

manage their data and conduct their operations.  As a software development tool, Endevor would

be used by developers, typically on a single mainframe computer, in contrast to programs such as

Microsoft Outlook that are used by all employees throughout an organization.  Because programs

under development can cause an organization's systems to crash, the computer used for software

development is typically segregated from the computers used by an organization to conduct its

operations.  For this reason, Endevor and E/NAT are typically installed on only one machine (or

"CPU") at a customer's site, as explained by CA's Endevor product manager for the relevant

time period, John Dueckman:

> In the situation where you have what I'll refer to as a multi-CPU or
> multi-computer mainframe enterprise . . . what an IT organization
> will do is identify and typically dedicate one of those machines as
> the development machine. . . . So this single development
> machine becomes the repository for the production version of
> things.  So that's where Endevor would be deployed, and that's
> where an interface to something like E/NAT, for example, would
> then deploy to....

Suppl. Decl. Ex. 4, Dueckman Dep. I at 101:22-102:17.  Reinforcing this fact, Atlantis's

principal, Mr. Gaugler, testified he was aware of only one customer that had installed E/NAT on

more than one machine (and even that customer had installed E/NAT on only two machines).

*See* Suppl. Decl. Ex. 3, Gaugler Dep. I at 74:22-76:5.[2]

　　　　Given its limited functionality, E/NAT never generated significant revenue for CA.  From

2004 to 2008, CA recognized only $7.5 million in revenue allocable to E/NAT.[3]  *See generally*

Suppl. Decl. Ex. 5, Chart, CA0057716-719.  Even assuming that E/NAT generated revenue at

that level throughout the term of the distribution agreement with Atlantis—a generous

assumption, given that there were significantly fewer licensees of E/NAT in earlier years—

E/NAT generated an estimated $17.5 million during the course of the parties' agreement.

Against that amount, CA has paid royalties to Atlantis of $9.4 million, or about 53% of revenues,

as reflected in over 150 pages of royalty reports produced in this case.[4]  In the software licensing

field, that is an extremely generous royalty.  According to unrebutted testimony from CA's

royalties expert, royalties for software products are generally in the range of 10-15% of revenue.

---

[2]　　Atlantis seems to have conceded this point.  Early in the case, Atlantis subpoenaed five CA customers who had
licensed E/NAT and asked those licensees to provide information regarding where E/NAT was installed.  Two of
those customers indicated that they had never installed E/NAT, and the three others had installed E/NAT on only
one machine.  Apparently recognizing that it was creating a record that would be harmful to its case, Atlantis ceased
its efforts to obtain this information.

[3]　　CA did not maintain revenue figures on a per-product basis until 2004.

[4]　　These royalty reports are not attached as exhibits, but will be provided upon the Court's request.

*See* Suppl. Decl. Ex. 6, Expert Report of Larry W. Evans Pursuant to Fed. R. Civ. P. 26(A)(2)(B), at ¶ 42.

Atlantis licensed E/NAT to CA until early December of 2007, at which point CA replaced E/NAT with its own product. *See* Suppl. Decl. Ex. 7, Ltr. fm. J. Lamm to A. Gaugler dated May 29, 2007; Ex. 4, Dueckman Dep. II at 24:20-25:3. CA paid approximately $650,000 to develop the replacement product. *See generally* Suppl. Decl. Ex. 8, Treehouse Invoices CA0060384-396. CA now distributes that product to any CA customer desiring to use Endevor with the Natural programming language. Alternatively, the customer can license E/NAT directly from Atlantis.

### C.    CA Licensed E/NAT Bundled with Many Other Products

In almost all cases, CA licensed E/NAT in a bundle with many other software products. Suppl. Decl. Ex. 2, Gerardi Report at § 6.A; Suppl. Decl. Ex. 9, Dep. Tr. Dennis Kozak dated Nov. 25, 2008 ("Kozak Dep.") at 17:4-12; 29:7-30:5; 32:13-24; Ex. 10, Dep. Tr. Linda Betances dated Sept. 11, 2008 ("Betances Dep.") at 37:22-38:8. Many license bundles include hundreds of products. *See* Suppl. Decl. Ex. 9, Kozak Dep. at 19:13-20:4 and 146:23-149:5.

Although a customer could choose to license a particular software product for use on a specified mainframe computer, referred to as a "Designated CPU License," most of the license agreements at issue in this case are a type known as "MIPS" licenses. *See* Suppl. Decl. Ex. 2, Gerardi Report at Sch. 13. MIPS, or millions of instructions per second, is a standard measure of mainframe computer processing power. A MIPS license allows a client to use a licensed bundle of software products up to a certain MIPS capacity. Suppl. Decl. Ex. 11, Computer Associates Product Pricing Handbook, at CA00047086; Ex. 10, Betances Dep. at 89:14-17. The customer may install any or all of the licensed products on one or more of its CPUs, provided that the

aggregate power of those computers does not exceed the total licensed MIPS capacity in the

license agreement. *See* Suppl. Decl. Ex. 9, Kozak Dep. at 31:13-32:8; 123:13-124:10.

### D.   The Contracts at Issue

In 1997, the parties entered into the Software License Agreement ("SLA"). *See* Decl. of

Michael D. Schissel in Supp. Def. Mot. Partial S. J., dated Sep. 1, 2010 ("Schissel Decl."), Ex.

A, Software License Agreement dated February 28, 1997. Under the SLA, Atlantis granted CA

the non-exclusive right to license and distribute E/NAT in exchange for the royalties described in

the agreement. In 1998, the parties entered into the Second Amendment to the SLA.

Between late 1997 and 2004, the parties had various disputes relating to the calculation of

royalties under the Second Amendment. The issue came to a head in January 2004, when

Atlantis demanded that CA pay $945,000 in past royalties (the same time period for which

Atlantis *now* seeks $130 million) or consider terminating the relationship. *See* Ex. 12, Ltr. fm.

A. Gaugler to J. Ball dated Jan. 21, 2004, at CA00000367, 377, 379. In December 2004, CA and

Atlantis entered into a settlement agreement. *See* Schissel Decl., Ex. B, Settlement Agreement

dated December 10, 2004. As a condition of the Settlement Agreement, the parties entered into a

third amendment to the SLA ("Third Amendment"). *See* Schissel Decl., Ex. C, Third

Amendment to the Software License Agreement dated December 9, 2004.

#### *The Settlement Agreement and Plaintiff's Interpretation of "Installations"*

The Settlement Agreement resolved Atlantis's claim for past royalties through June 2004,

and required CA to pay Atlantis $500,000. *See* Schissel Decl., Ex. B, Settlement Agreement at ¶

1. It also contained a mutual general release "from any and all claims, known or unknown,

asserted or unasserted" arising from the SLA, as amended. *Id.* at ¶ 3. The general release

contained two exceptions. The one that is relevant here excepts:

> any claims, obligations or liabilities relating to any royalties due
> Atlantis for . . . any licensees and/or **installations of the Products**
> that have not been disclosed on any royalty report prepared by CA
> and delivered to Atlantis prior to June 30th, 2004 . . . .

*Id.* at ¶ 4 (emphasis added).

Atlantis's German attorney, Dr. Meinhard Erben, negotiated and drafted the Settlement

Agreement on behalf of Atlantis.  Dr. Erben testified that he inserted the phrase "installations of

the Products,"[5] and that it means actual installation on a computer:

> Q:   When you inserted it, that phrase, in whatever draft it first
>       appeared, what did you understand it to mean, that phrase
>       "installations of the products" . . . If you had an
>       understanding.
> A.   Yes.  I had an understanding.  It's when a copy of the
>       product, which is E/NAT, is installed on a computer.

Schissel Decl., Ex. E, Erben Dep. at 61:15-24.

Discovery has shown that as of the date of the Settlement Agreement, CA neglected to

disclose only a few "installations of the Products."  Those installations are not covered by the

release and result in a modest sum owed to Atlantis.  Unwilling to limit its claims to that amount,

Atlantis's counsel instructed Atlantis's damages expert, Mark Warshavsky, to assume that the

term "installation" in the phrase "installations of the Products" means "**could have been**

installed."  Suppl. Decl. Ex. 13, Dep. Tr. Mark Warshavsky dated July 8, 2009 ("Warshavsky

Dep.") at 77:19-25.  There is no record testimony to support this interpretation and Mr.

Warshavsky admitted he was merely following the instructions of counsel.  *See id.* at 78:1-9.

Following counsel's instructions, Mr. Warshavsky then calculated royalties for the pre-

settlement period based on any computer on which a CA customer *could have* installed E/NAT.

---

[5]     Schissel Decl., Ex. E, Dep. Tr. Meinherd Erben dated February 13, 2008 ("Erben Dep.") at 60:21-61:7 ("I'm
certain [the phrase 'installations of the products'] is Atlantis's suggestion. . . .  I am very sure that Atlantis brought
that into the negotiations.").

Thus, Mr. Warshavsky calculated royalties assuming that the entire licensed MIPS capacity in a contract was attributable *entirely* to E/NAT. *See* Suppl. Decl. Ex. 14, Expert Witness Report dated Mar. 20, 2009, at § 7; Ex. 13, Warshavsky Dep. at 149:4-150:5. This assumption is patently incredible. It assumes that CA's customers are licensing software to be used only in a development environment, when in fact most of the licensed software was used in a production environment. It also assumes that *all* of CA's customers are developing *all* of their software applications using the Natural programming language to the exclusion of the predominant IBM-supported languages. By re-writing the Settlement Agreement in this manner, Atlantis claims over $130 million for the pre-settlement period.

### *The Third Amendment and Plaintiff's Interpretation of "Use"*

Under the Third Amendment, CA agreed to pay Atlantis a certain royalty for "each copy of [E/NAT] distributed by CA to customers." Schissel Decl. Ex. C, Third Amendment at CA0000688. It also provided that additional royalties would be triggered if a CA customer used E/NAT on more than one machine:

> "In case a client **uses** the software on more than one (1) MACHINE, the following rules shall be applied:
>
> 1.  The largest MACHINE on which the software is installed shall be used to calculate the basic fees (with 34% royalty).
> 2.  **For each additional MACHINE the additional royalties shall be 20% (instead of 34%) of the "G1" list price."**

*Id.* at 689 (emphasis added).

Atlantis's principal, Mr. Gaugler, testified that well before Atlantis executed the Third Amendment, he understood the term "use" to mean actual use by a CA customer. In correspondence sent to CA in November 1997 addressing certain issues under the SLA, Mr. Gaugler stated, "E/NAT sales are done on the usual basis [which] means that the license fee will be based on the hardware a client uses and **on the number of machines E/NAT is used on**."

-8-

Suppl. Decl. Ex. 15, Ltr. fm. A. Gaugler to M. Combs and E. Ross dated Nov. 12, 1997 at

A 000699 (emphasis added).  When examined on this document at his deposition, Mr. Gaugler

testified:

> Q:    You say the license fee is supposed to be based on the
>       number of machines E/NAT is used on; correct?
>
> A:    I refer to the hardware and the number of machines.
>
> Q:    Number of machines E/NAT is used on, correct?
>
> A:    Yes, correct.
>
> Q:    And that was your belief, that the license fee was based on
>       the number of machines E/NAT is used on?
>
> A:    Yes.

Suppl. Decl. Ex. 3, Dep. Tr. Alexander Gaugler dated Jan. 25, 2008 ("Gaugler
Dep. II") at 191:25-192:16 (objections omitted).

In addition, Atlantis's own software licensing expert, Steven Kursh, acknowledged that

royalties are tied to actual use:

> Q:    What does it mean in the custom and practice in the
>       software industry when it says "in the case a client uses
>       the software on more than one machine"?
>
> A:    That term in customs and practice of the industry in the
>       context of what is in this document indicates that the
>       licensing model, how the royalties will be calculated, will
>       be based on if you use it on one machine, if you -- **again,
>       if it's installed on more than one machine, then this is
>       how the royalties will be calculated**.  As I note in my
>       report, this is typical in the industry, that you have a lower
>       percentage for additional machines, discounts are
>       provided on a per-metric basis, if you will.  They are often
>       provided on a per metric basis, *i.e.*, if you buy more from
>       us, we will give you a discount.

Schissel Decl., Ex. F, Dep. Tr. Steven Kursh dated June 26, 2009 ("Kursh Dep.") at 238:23-

239:13 (emphasis added).

Atlantis's damages expert, Mr. Warshavsky, based on the instructions of Atlantis's counsel on how he should interpret "install," purported to "interpret" the word "use" in the Third Amendment to mean "licensed to use" to arrive at $59 million in damages for the post-settlement period. *See* Suppl. Decl. Ex. 13, Warshavsky Dep. at 77:19-78:16. Therefore, for the post-settlement period Mr. Warshavsky calculated royalties for E/NAT based upon the entire MIPS capacity in a CA customer contract. Mr. Warshavsky admitted that he interpreted "use" without considering the testimony of any of the witnesses who negotiated and drafted the Third Amendment, *see id.* at 265:5-270:12, and that such testimony was irrelevant to him:

> Q:    And am I right, sir, that you were sticking with your interpretation of the third amendment regardless of what the negotiators had to say about it?  Right?
>
> A:    Correct.

*Id.* at 270:14-20 (objection omitted).  Instead, Mr. Warshavsky purported to interpret the parties' agreement so that "use" does not mean actual use, even though he has no experience with software license agreements. *Id.* at 108:17-24; 17:17-18:8. Moreover, Mr. Warshavsky conceded that he had no evidence that any customer "use[d] E/NAT on more than one machine." *Id.* at 108:7-21.

Mr. Warshavsky's methodology leads to a result that is economically irrational. It is estimated that CA received no more than $17.5 million in revenue allocable to E/NAT over the life of the parties' relationship, of which CA paid Atlantis $9.4 million in royalties. Atlantis now seeks additional royalties that are more than 800% of the revenue CA earned on E/NAT.

For the reasons set forth below, CA's motion for partial summary judgment should be granted.

## ARGUMENT

Summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). Although the Court will construe the facts and inferences in favor of the party opposing the motion, mere speculation and conjecture are insufficient to preclude the granting of the motion. *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court's partial summary judgment determination on the meaning of "installation" and "use" directly addresses Plaintiff's claim[6] and will serve the interest of judicial economy by substantially reducing the number of issues at trial, an underlying purpose of summary judgment. Because there is no genuine issue of fact with respect to the meaning of these terms, partial summary judgment in favor of CA should be granted.

## I.   "INSTALLATION" AND "USE" ARE UNAMBIGUOUS AND MEAN ACTUAL USE AND ACTUAL INSTALLATION OF E/NAT

Contracts are interpreted to effect the contracting parties' intent. *See Law Debenture Trust. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *Greenfield v.*

---

[6]    *See Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 2010 WL 2423581 at *3-*4 (E.D.N.Y. 2010) (Cogan, J.). In this recent case, Judge Cogan concluded that a "claim" is composed of both the theory of liability and the remedies that that theory supports, and that the only way for the court to evaluate a motion on part of a claim is through use of the Rule 56 inquiry.

*Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).  Because the "'best evidence of what parties to

a written agreement intend is what they say in their writing,'" "[a] clear and unambiguous

[contract] . . . must be enforced according to the plain meaning of its terms." *Greenfield*, 98

N.Y.2d at 569 (quoting *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992)).  Whether a contract

is unambiguous is a question of law to be decided by the court.  *See Continental Ins. Co. v.

Atlantic Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010).

Contract terms are unambiguous when they are capable of a "'definite and precise

meaning, unattended by danger of misconception in the purport of the [contract] itself, and

concerning which there is no reasonable basis for a difference of opinion.'"  *Hunt Ltd. v.

Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citation omitted, substitution

in original).  Otherwise clear and precise contract terms do not become ambiguous "merely

because the parties urge different interpretations in the litigation." *Id.*; *see also Bethlehem Steel

Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 460 (1957) ("Mere assertion by one that contract

language means something to him, where it is otherwise clear, unequivocal and understandable

when read in connection with the whole contract, is not in and of itself enough to raise a triable

issue of fact.").  Specifically, a "court should not find the contract ambiguous where the

interpretation by one party would 'strain [] the contract language beyond its reasonable and

ordinary meaning.'"  *Law Debenture Trust Co.*, 595 F.3d at 467 (quoting *Bethlehem Steel Co.*, 2

N.Y.2d at 459; substitution in original).

Courts may not consider extrinsic evidence of the parties' intent when interpreting

unambiguous contracts.  *See Greenfield*, 98 N.Y.2d at 569; *see also Law Debenture Trust Co.*,

595 F.3d at 467-68; *Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d

Cir. 1990) (a party "is precluded from introducing extrinsic evidence of the contract's purpose in

order to vary the plain meaning of the writing").  Having determined that a contract is

unambiguous, the court must enforce that contract "'according to the plain meaning of its

terms.'"  *Continental Ins. Co.*, 603 F.3d at 180 (quoting *Hatalmud v. Spellings*, 505 F.3d 139,

146 (2d Cir. 2007)) (finding contract term unambiguous).

### A.     "Installation" Is Unambiguous

The word "installation" is clear, precise and unambiguous,[7] and its meaning in the

context of the Settlement Agreement is not reasonably open to a difference of opinion.  The plain

meaning of "installation" is a CA customer's actual installation of E/NAT.  If the parties, both of

whom were represented by counsel, intended the exception to the release to cover any

undisclosed computing capacity on which E/NAT *could have been* installed, they could and

would have said so in the Settlement Agreement.  They did not, and Plaintiff should not be

permitted to re-write the contract to advance its position in this litigation.

Accordingly, summary judgment on the meaning of "installation" in favor of CA should

be granted.

### B.     "Use" Is Unambiguous

The word "use" also is definite, precise and unambiguous.[8]  Viewed objectively by a

reasonable person in the context of the Third Amendment, "use" means a CA customer's actual

use of E/NAT.  Indeed, the provision in which "use" is contained makes clear it is referring to

actual use on a computer:  "In case a client uses the software on more than one (1) MACHINE" a

royalty will be paid at 34%, and "For each additional MACHINE," a royalty will be paid at 20%.

---

[7]     *See Random House Webster's Unabridged Dictionary* (2d ed. 2001) ("placed in position or connected for
use"); *see also American Heritage Dictionary of the English Language* (4th ed. 2009) ("a system of machinery or
other apparatus set up for use"); *Microsoft Computer Dictionary* (5th ed. 2002) (defining "install" as "[t]o set in
place and prepare for operation").

[8]     See *Random House Webster's Unabridged Dictionary* ("put into service"); see also *American Heritage
Dictionary of the English Language* ("to put into service or apply for a purpose").

Schissel Decl. Ex. C, Third Amendment at CA0000689.  What "use" clearly does not refer to is a

CA customer's hypothetical "use" of E/NAT on its entire licensed computing capacity; nor does

it mean "licensed to use."

Here again, Atlantis should not be permitted to re-write the parties' agreement for

purposes of advancing its claim in this case.  The plain meaning of the unambiguous term "use"

in the Third Amendment could not be more clear, and partial summary judgment in favor of CA

should be granted.

**II.     ANY AMBIGUITY IN "INSTALLATION" AND "USE" SHOULD BE
         RESOLVED BY THE COURT IN FAVOR OF CA BASED ON THE EXTRINSIC
         EVIDENCE**

If the Court determines that "installation" or "use" contain some ambiguity, it can resolve

the ambiguity as a matter of law.  While the interpretation of ambiguous contract language is

often a question of fact, *see Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116

(2d Cir. 1994), summary judgment is appropriate where "'the extrinsic evidence creates no

genuine issue of material fact and permits interpretation of the agreement as a matter of law.'"

*Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999) (citing *Nycal Corp. v.

Inoco PLC*, 988 F. Supp. 296, 299 & nn.9-11 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir.

1998)).  Moreover, a court may "grant summary judgment regarding the interpretation of

ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence

supporting that party's interpretation of the language," *Compagnie Financiere de Cic et de

L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir.

2000), or where the extrinsic evidence is so one-sided that no reasonable fact finder could decide

contrary to one party's interpretation. *Nycal Corp.*, 988 F. Supp. at 299-300; *see also Collins v.

Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002).

The overwhelming evidence here makes it clear that the parties intended "installation" and "use" to mean actual installation and use of E/NAT by CA customers, not to mean hypothetical "licensed" installation or use. On this record, the Court can interpret these terms as a matter of law and partial summary judgment should be granted in favor of CA.

**A.    Extrinsic Evidence Demonstrates That
         "Installation" Means Actually Installed**

Even if the Court were to find "installation" ambiguous, the extrinsic evidence shows that, as used in the Settlement Agreement, "installation" means actual installation by a CA customer. Most notable is the testimony from Atlantis's own attorney, who inserted that term into the Settlement Agreement. As discussed above, he testified unequivocally that "installations of the Product" means "when a copy of the product, which is E/NAT, is installed on a computer." Schissel Decl. Ex. E, Erben Dep. at 61:15-24. That admission should put this issue to rest. If not, the testimony from CA's lawyer who negotiated the Settlement Agreement is consistent with Dr. Erben's testimony. *See* Schissel Decl. Ex. D, Dep. Tr. Alexander Arato dated Mar. 13, 2008 ("Arato Dep.") at 145:8-10 (installation site means "an undisclosed physical location, geographic location where the software was installed, and by 'installed' I meant in use."). In addition, the Court should interpret the term against its drafter, Atlantis. *See Moldofsky v. Moldofsky*, 43 A.D.3d 1011, 1012 (2d Dep't 2007) ("Any ambiguity . . .in the agreement must be construed against the drafter . . . ."). Importantly, there is *no* extrinsic evidence supporting the interpretation Atlantis now seeks to advance.

**B.    Extrinsic Evidence Demonstrates That
         "Use" Means Actually Used by the CA Customer**

Even if the Court were to find "use" ambiguous, the extrinsic evidence shows that, as used in the Third Amendment, "use" means actual use of E/NAT by a CA customer on more than one machine. As discussed above, Atlantis's principal, Mr. Gaugler, testified that he

-15-

understood that "use" means actual use and not licensed to use. Moreover, the attorney for Atlantis who drafted the relevant provision in the Third Amendment testified that the 20% additional royalty rate only applied if "the client uses the software on more than one machine." Schissel Decl., Ex. E, Erben Dep. at 56:20-25.[9] Finally, Atlantis's own software licensing expert testified that "royalties will be calculated, will be based on if you use [E/NAT] on one machine, if you -- again, if it's installed on more than one machine, then this is how the royalties will be calculated." *See* Schissel Decl., Ex. F, Kursh Dep. at 239:3-7. There is no extrinsic evidence to the contrary.

The only purported evidence to support Atlantis's interpretation of "use" is an eleventh-hour, self-serving affidavit submitted by Mr. Gaugler, in response to CA's Rule 56.1 Statement that directly contradicts his deposition testimony. In his September 16, 2010 declaration, Mr. Gaugler states that it was "always" Atlantis's understanding that "use" referred to a CA customer's "rights" to use and install E/NAT, and not to a customer's actual use or installation of the software. Suppl. Decl., Ex. 16, Decl. of A. Gaugler Opp. Def. Mot. Partial S. J. Pl. Claim for Breach of Contract dated September 16, 2010, at ¶ 5. Under the law of this Circuit, however, a party cannot manufacture by affidavit an issue of material fact that contradicts the affiant's prior testimony. *See Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (holding that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony") (citations omitted). In his affidavit, Mr. Gaugler also points to no

---

[9]     Dr. Erben testified that the relevant provision in the Third Amendment was requested by Mr. Gaugler, which Dr. Erben "put into words." Schissel Decl. Ex. E, Erben Dep. at 54:16-55:3. Again, to the extent the Court finds Dr. Erben's testimony in any way inconsistent with CA's interpretation, the term must be construed against Atlantis as the drafter. *See Moldofsky*, 43 A.D.3d at 1012.

document or witness testimony that independently supports his newly minted "understanding." *See* Suppl. Decl. Ex. 16.

### C.   Plaintiff's Interpretation Could Not Have Been Contemplated by the Parties Because it is So Economically Irrational

It is black letter law that when interpreting a contract, a court should consider what damages were "fairly within the contemplation of the parties . . . at the time [the contract] was made." *Mortimer v. Otto*, 206 N.Y. 89, 91-92 (1912) (citations omitted); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (court interpreting contract must consider "'what liability the defendant fairly may be supposed to have assumed consciously'") (citations omitted).

There is no way that CA contemplated paying $190 million in royalties for an accessory product for which CA earned $17.5 million in revenues over ten years and which could have been, and was, replaced for less than $1 million.  As it is, CA paid 53% of those revenues to Atlantis, a generous amount in the industry.  CA's licensing and royalty expert, Larry Evans, submitted a report—which Atlantis did not rebut—explaining that the median royalty rates in the software industry are 7.5% of revenues.  The royalty Atlantis seeks in this litigation is 800% of the revenues CA received on E/NAT.

There is no evidence that the either party contemplated CA paying such an extraordinary royalty.  Indeed, in the negotiations leading to the Third Amendment, CA made clear  that it had been paying too much in royalties.[10]

In sum, Atlantis should not be permitted to advance an interpretation of the terms "installation" and "use" that contravenes the plain meaning of the words and contradicts the

---

[10]   *See, e.g.,* Suppl. Decl. Ex. 17, Email fm. J. McGarry to A. Gaugler dated Dec. 3, 2003, responded to by A. Gaugler on Dec. 3, 2003, at A 014137 ("We want to move forward as well but under the current terms it is not favorable for CA given the activity over the last few years.").

overwhelming extrinsic evidence of what the parties intended at the time those words were used, so that a damages expert with no experience in software licensing agreements can in turn advance an astronomical damages claim. Partial summary judgment in favor of CA, establishing that the terms "installation" and "use" in the agreements at issue mean actual, and not potential or hypothetical, installation and use, should therefore be granted.

## CONCLUSION

For the foregoing reasons, CA respectfully requests that the Court enter partial summary judgment in CA's favor finding that "installation" in the Settlement Agreement and "use" in the Third Amendment mean, respectively, actual use and actual installation by a CA customer.

Dated: New York, New York
       November 15, 2010

                            Respectfully submitted,

                            ARNOLD & PORTER LLP

                            By: _Michael D. Schissel_ /e
                                Michael D. Schissel
                                Pamela A. Miller
                                399 Park Avenue
                                New York, NY 10022
                                (212) 715-1000

                                John P. McEntee
                                FARRELL FRITZ, P.C.
                                1320 RXR Plaza
                                Uniondale, New York 11556-1320
                                Tel: (516) 227-0700
                                Fax: (516) 227-0777

                                *Attorneys for Defendant CA, Inc.*