UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
ATLANTIS INFORMATION
TECHNOLOGY, GmbH,

              Plaintiff,

     -against-                <u>MEMORANDUM & ORDER</u>
                                    06-CV-3921(JS)(ETB)
CA, INC.,

              Defendant.
--------------------------------------X
APPEARANCES:

For Plaintiff:      J. Christopher Jensen, Esq.
                   Ronald W. Meister, Esq.
                   Eric Joseph Shimanoff, Esq.
                   Jonathan Z. King, Esq.
                   Cowan, Liebowitz & Latman, P.C.
                   1133 Avenue of the Americas
                   New York, NY 10036-6799

For Defendant:     John P. McEntee, Esq.
                   Norma B. Levy, Esq.
                   Patrick Collins, Esq.
                   Kevin Patrick Mulry, Esq.
                   Farrell Fritz, P.C.
                   EAB Plaza, West Tower, 14th Floor
                   Uniondale, NY 11556-0120

                   Michael D. Schissel, Esq.
                   Pamela Addison Miller, Esq.
                   Anthony D. Boccanfuso, Esq.
                   Arnold & Porter LLP
                   399 Park Avenue
                   New York, NY 10020-4690

                   Adam T. Bernstein, Esq.
                   CA, Inc.
                   1 CA Plaza
                   Islandia, NY 11749

SEYBERT, District Judge:

Plaintiff Atlantis Information Technology, GmbH ("Atlantis") sued Defendant CA, Inc. ("CA") for CA's alleged underpayment of software royalties under the parties' licensing agreement. CA asserted both an affirmative defense and a counterclaim based on Atlantis' alleged failure to develop updates for the software. Pending before the Court are three motions for summary judgment: (1) Atlantis' motion for partial summary judgment on liability for its breach of contract claim; (2) Atlantis' motion for summary judgment on CA's affirmative defense and breach of contract counterclaim; and (3) CA's motion for partial summary judgment as to the meaning of the words "installation" and "use" in the Software License Agreement (the "SLA").[1] The first motion is DENIED and the second motion is GRANTED IN PART AND DENIED IN PART. The third motion is DENIED AS MOOT, inasmuch as the Court addressed CA's arguments on that motion in its rulings on Atlantis' first motion.

---

[1] There are three sets of motion papers pending before the Court. For relative ease of reference, the Court refers to the papers in support of the first motion as "Pl. Breach Br. __," "Def. Breach Opp. __," and "Pl. Breach Reply __," respectively. The Court refers to the papers in the second motion, which concerns Atlantis' alleged failure to enhance and update the E/NAT software, as "Pl. Update Br. __," "Def. Update Opp. __," and "Pl. Update Reply __," respectively. The Court refers to the third set of papers as "Def. Interpretation Br. __," "Pl. Interpretation Opp. __," and "Def. Interpretation Reply __," respectively.

Also pending is Atlantis' letter motion to preclude the testimony of one of CA's expert witnesses. That motion is GRANTED.

<u>BACKGROUND</u>

CA developed and licensed a software program called CA Endevor Software Change Manager ("Endevor") to businesses that develop mainframe applications. (Def. Update Opp. 2.) As CA helpfully explains, Endevor is akin to a "track changes" tool for software developers. (<u>Id.</u>) The program works with certain IBM-supported computer programming languages. (<u>Id.</u>) Programmers who use the "Natural" computer language, which is not supported by IBM, cannot use Endevor to manage their development unless they also deploy interfacing software as a bridge between Endevor's track changes function and the Natural programming language. (<u>See</u> <u>id.</u>) Atlantis' "E/NAT" software bridged that gap. (Alexander Gaugler Breach Declaration "Gaugler Breach Decl." ¶ 4.) With E/NAT, CA's customers could use Endevor to track the development of applications rooted in the Natural programming language.

I. <u>The Software License Agreement</u>

In February 1997, CA and Atlantis entered into a SLA that granted CA a worldwide license to use, market, distribute and sublicense E/NAT software. (<u>See</u> <u>generally</u> Gaugler Breach Decl. Ex. A, SLA ("SLA ¶ _").) In general terms, the SLA

required CA to pay Atlantis substantial royalties in exchange for its licensing rights. (See SLA ¶ 5.1.)

Subsection 1(a) of Exhibit B to the SLA (the "Royalties Provision") described how to calculate royalties:

> Royalties. For each copy of the Product distributed by CA to Customers, CA shall pay a royalty equal to forty percent (40%) of the Net License Fees revenues received by CA from the licensing of the Products by CA to Customers or Distributors and fifty percent (50%) of the Net Maintenance Fee revenues.

(SLA, Ex. B ¶ 1.a.) "Net License Fees" were defined in relevant part as "the aggregate license fee revenues (including year 1 maintenance service if bundled with the initial license price) collected by CA during each CA fiscal quarter pursuant to license agreements respecting the Product." (Id.) "Net Maintenance Fees" were defined in relevant part as "the aggregate maintenance renewal revenues collected by CA during each CA fiscal quarter pursuant to license agreements respecting the Product." (Id.)

Exhibit B's "Bundled Product Sales" clause described how royalties would be calculated when CA licensed E/NAT together with its own software programs:

> Bundled Product Sales. If the Product is licensed or leased with other hardware or software products priced together or sold as a single unit or as part of a combined lease or license of the Product with such other products (a "Bundled Product Sale"), then the Net License Fee and Net Maintenance Fee

4

> amounts arising from such Bundled Product
> Sales will be the pro-rata amount
> attributable to the Product, with such
> allocation being based on CA's standard list
> prices for each of the products included in
> the Bundled Product Sale in question (i.e.,
> a greater discount will not be applied to
> the Supplier Products than to the bundled CA
> software products included in the same
> sale).

(SLA, Ex. B ¶ 1.b.)

Because royalties were pegged as a percentage of the licensing revenues CA received from its customers, the SLA contained a "reasonable efforts" clause that required CA to "use reasonable efforts to ensure that it does not offer discounts in excess of thirty percent (30%) from" Atlantis' then-prevailing list prices without first consulting Atlantis. (SLA Ex. B ¶ 1.c.)

## II. The Second Amendment

In July 1998, CA and Atlantis executed Amendment Number Two to the SLA (the "Second Amendment").[2] (Gaugler Breach Decl. ¶ 16.) The Second Amendment deleted the SLA's Royalties Provision and replaced with a clause that read, in relevant part:

> Royalties. For each copy of the Product
> distributed by CA to Customers, CA shall pay
> an "Initial License Fee" which is defined as
> an amount equal to thirty-four percent (34%)
> of the "G1" list price for licensing and

---

[2] The parties apparently amended the SLA once before, but the "First Amendment" is not relevant to this dispute.

> maintenance during the Initial License
> Period . . . for each license agreement
> respecting the Product.

(Gaugler Breach Decl. Ex. B, Second Amendment ¶ 1.a.) The "G1 List Price" was "the one time [sic] fee paid by a licensee inclusive of usage and maintenance for a one year period (as provided in CA's then standard 'Order Form')." (Id. ¶ 1.b.)[3] According to Atlantis, the G1 List Price was determined by reference to a table where prices varied according to the processing power of the computer on which E/NAT was licensed, as expressed in millions of instructions per second, or "MIPS." (Pl. Breach Br. 11.)

III. Royalty Dispute, Settlement Agreement and Third Amendment

Around 2004, the parties began disputing the amount of CA's royalty obligation. (Gaugler Breach Decl. ¶ 25.) They eventually resolved their differences, and simultaneously executed a Settlement Agreement and a Third Amendment to the SLA (the "Third Amendment"). (Id. ¶ 26.)

A. Settlement Agreement

Dated December 10, 2004, the Settlement Agreement provided in relevant part that CA would pay Atlantis $500,000 and both parties would release each other "from any and all claims, known or unknown, asserted or unasserted, which arise

---

[3] The parties dispute whether CA's Order Form was incorporated by reference into the Second Amendment, but this point is not material to the Court's analysis.

out of or relate in any way to: (i) the Software License Agreement for the period February 28th, 1997 until [December 10, 2004]." (Gaugler Breach Decl. Ex. C, Settlement Agreement ¶ 3.) The release had two exceptions, but only one is relevant here: "Atlantis does not release CA . . . from any claims, obligations or liabilities relating to any royalties due Atlantis for: . . . any licensees and/or installations of the Products that have not been disclosed on any royalty report prepared by CA and delivered to Atlantis prior to June 30th, 2004." (Id. ¶ 4.)

    B. <u>Third Amendment</u>

        The Third Amendment was another attempt to clarify the royalty formula. In relevant part, the Third Amendment provided:

> WHEREAS, the parties wish to amend the [SLA] by the addition of clarifying sections to the existing royalty and payment terms of the [SLA];
>
> . . .
>
> I. Amendments to the Principal Royalty and Payment Terms of the Agreement
>
> 1. Any and all royalty and payment terms of the [SLA], in particular, without limitation, Exhibit B of the [SLA], "Commercial Terms", shall hereby be amended to the following effect:
>
> Royalties. For each copy of the Product distributed by CA to customers, CA shall pay to Atlantis an amount equal to thirty-four percent (34%) of the "G1" list price, which fee shall be inclusive of maintenance for

the one (1) year period after the delivery
of the Product from CA to CA's customer. . .
.

(Gaugler Breach Decl. Ex. D, Third Amendment at 1.) The G1 List

Price was defined in a way similar to the Second Amendment

(id.), and this time the price table, which pegged royalties to

the computing power of the machine on which E/NAT was licensed,

was explicitly incorporated into the contract (id. at 2). As

with the Second Amendment, the Third Amendment required CA to

report certain data about its customers and their computers.

(Id. at 3.)

The Third Amendment also contained language addressing

how to compute royalties when E/NAT was used on multiple

computers:

> In case a client uses the software on more
> than one (1) MACHINE, the following rules
> shall be applied:
>
> 1. The largest MACHINE on which the software
> is installed shall be used to calculate the
> basic fees (with 34% royalty).
> 2. For each additional MACHINE the
> additional royalties shall be 20% (instead
> of 34%) of the "G1" list price.

(Id. at 2 (emphasis added).)

IV. <u>MIPS Licensing and the Present Royalty Dispute</u>

The present royalty dispute centers around the two

methods CA allegedly used to calculate its royalty obligation.

To understand Atlantis' claims, however, it is helpful to start

with a discussion of "MIPS Licensing."  In almost all cases, CA licensed E/NAT in a bundle, often with hundreds of other software products.  (Def. Breach Opp. 4.)  Although customers had the option of licensing a software product for use on a specified mainframe, a so-called "Designated CPU License," the majority of CA's customers opted for a "MIPS License."  As CA explains, a MIPS License:

> allows a client to use a licensed bundle of software products up to a certain MIPS capacity.  The customer may install any or all of the licensed products on one or more of its CPUs, provided that the aggregate power of those computers does not exceed the total licensed MIPS capacity in the license agreement.

(Def. Contract Opp. 5 (citations omitted).)  There is no evidence that any MIPS License customer actually installed E/NAT on more than one computer; in CA's view, that is unsurprising because E/NAT is designed for the type of database development work that is typically performed on single, segregated mainframes within each customer's network.  (See id.)

Atlantis alleges that CA devised two formulas for calculating royalties, neither of which conformed to the SLA or the applicable amendments.  First, Atlantis claims that during the Second Amendment Atlantis simply paid a royalty based on the G1 List Price of each customer's most powerful computer, regardless of whether that customer was licensed to use E/NAT on

more than one computer. (Pl. Breach Br. 14.) <u>Second</u>, Atlantis claims that, during the Third Amendment, CA devised a complex "MIPS allocation" formula. Although the contours of this formula are not entirely clear to the Court, it apparently determined royalties in part based on the relative number of MIPS each customer needed to run E/NAT as compared to the MIPS it needed for the other software in the licensed bundle. (See Pl. Breach Br. 19.) In Atlantis' view, both formulas violated the unambiguous language of the SLA and its amendments.

V. <u>The Enhance and Update Clause</u>

Apart from the royalty dispute, the parties also disagree whether Atlantis breached the SLA's "Update Clause," which required Atlantis to "continuously enhance and update the Product to ensure that the Product supplied to CA will include . . . all modifications necessary to support new versions of the CA Software on the MVS Operating Environment." (SLA ¶ 2.4.) According to CA, Atlantis was slow to develop updates for E/NAT, unveiling only one "version" upgrade and one "point" upgrade in ten years. (Def. Update Br. 3.)[4]

From as early as 1999, Atlantis repeatedly reassured CA that it was working on E/NAT Version 3.0. For example, in

[4] A "version" upgrade (<u>e.g.</u>, Version 2.0 to Version 3.0) is a change to the software's core functionality, while a "point" upgrade (<u>e.g.</u>, Version 2.2 to Version 2.3) is a change to the software's features without changes to its core functionality. (Def. Update Br. 3.)

June 1999, Alexander Gaugler--Atlantis' Managing Director (<u>see</u> Pl. Breach 56.1 Stmt. ¶ 20)--told a CA employee that "We are currently developing the basic functions for E/NAT 3.0." (Pamela Miller Declaration ("Miller Decl.") Ex. 2.) Two years later, he told a different CA employee that Atlantis expected to be ready for beta-testing on Version 3.0 in the fourth quarter of 2001 and that the final version should be ready by the second quarter of 2002. (Miller Decl. Ex. 3.) In March 2002, Gaugler told the same employee that Atlantis was not yet beta-testing Version 3.0, but that "I'm sure that we are close to it now." (<u>Id.</u>) More than a year later, CA again asked about Version 3.0's status, and Gaugler responded: "We are making progress with E/NAT 3.0 but still not the exicting [sic], news you are waiting for." (Miller Decl. Ex. 4.) Less than two weeks later, Gaugler told CA that Version 3.0 would not be ready for beta testing until at least 2004. (<u>See</u> Miller Decl. Ex. 5.) In November 2003, CA received an inquiry about possible updates to E/NAT, and Gaugler again reassured that Atlantis was developing a new release:

> Unfortunately your impression about the updates is correct. However, we are working on the new release, but for several reasons it took much longer than ever expected. Due to our move to the new office (and the side effects) I now hope that we'll do the big step in the 2nd quarter next year. I know, it looks like we aren't doing further development, but that's not the reality! Of

> course, we provided all fixes necessary and
> see some increase in sales requests.

(Miller Decl. Ex. 8.)

Despite Gaugler's assurances, Version 3.0 was not ready even towards the end of 2005. In November 2005, CA asked Gaugler whether Atlantis had updated E/NAT to address a specific customer's concern. (Miller Decl. Ex. 9.) Gaugler responded: "E/NAT v3 is not yet available (no comments, please). But it will become available!!!" (Id.)

During his 2008 deposition, Gaugler stated that, due to Atlantis' earlier royalty dispute with CA, Atlantis had stopped development on E/NAT Version 3.0 between 2002 and 2003. (Miller Decl. Ex. 10, Gaugler 1/24/08 Dep. 93-94.)

According to CA, when the parties' relationship began deteriorating in 2006, it developed its own software to replace E/NAT. The development took approximately one year and cost approximately $650,000. (See Def. Update Opp. 9.)

## DISCUSSION

The Court first addresses Atlantis' motion for partial summary judgment on the liability aspect of its breach of contract claim. In ruling on this motion, the Court addresses the arguments CA makes in its motion for partial summary judgment concerning the plain meanings of "installation" and "use." The Court next considers Atlantis' motion for summary

judgment on CA's affirmative defense and breach of contract counterclaim. Finally, the Court considers Atlantis' letter motion to preclude one of CA's experts.

Summary judgment is only appropriate where the moving party can demonstrate that there is "no genuine dispute as to any material fact" and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In considering this question, the Court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also FED. R. CIV. P. 56(c). "In assessing the record to determine whether there is a genuine issue to be tried . . . the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee, 109 F.3d at 134. The burden of proving that there is no genuine issue of material fact rests with the moving party. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994) (citing Heyman v. Com. & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975)). Once burden is met, the non-moving party must "come forward with

specific facts," <u>LaBounty v. Coughlin</u>, 137 F.3d 68, 73 (2d Cir. 1998), to demonstrate that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 257, 106 S. Ct. 2505, 2514-15, 91 L. Ed. 2d 202, 218 (1986). "Mere conclusory allegations or denials will not suffice." <u>Williams v. Smith,</u> 781 F.2d 319, 323 (2d Cir. 1986). And "unsupported allegations do not create a material issue of fact." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000).

I. <u>Royalty Payments</u>

Atlantis claims that CA breached the SLA by improperly calculating its E/NAT royalty obligations under the Second and Third Amendments and by failing to meet its reporting obligations under the Third Amendment. These disputes stem from an overall failure of the SLA to speak more directly to the concept of MIPS Licenses as opposed to the more commonly understood CPU-specific licenses. In any event, the case is best understood by breaking it down into two time periods: during the Second Amendment and during the Third Amendment.

A. <u>The Second Amendment</u>

During the Second Amendment, Atlantis claims that CA only paid royalties on one CPU per customer, regardless of whether that customer was licensed to use E/NAT on more than one machine. According to Atlantis, CA deliberately failed to

14

report customers' additional CPUs, thereby cheating Atlantis out of royalties owed to it under the Second Amendment, which pegged royalty payments as a percentage of the "list price" for each CPU. (Pl. Breach Br. 3.) This theory is largely foreclosed by the Settlement Agreement.[5]

In relevant part, the Settlement Agreement unambiguously releases CA from royalty claims except those relating "to any royalties due Atlantis for: (A) any licensees and/or installations of the Products that have not been disclosed on any royalty report prepared by CA and delivered to Atlantis prior to June 30th, 2004 . . . ." (Gaugler Decl. Ex. C, Settlement Agreement ¶ 4.) The Court agrees with CA that "installations" plainly means "actually installed," not "licensed for installation." Contract terms must be given their plain and ordinary meaning, e.g., Nisari v. Ramjohn, 85 A.D.3d 987, 989, 927 N.Y.S.2d 358, 361 (2d Dep't 2011), and Merriam-Webster's, for example, defines the term as "1: the act of

---

[5] Atlantis argues that CA's motion for partial summary judgment on Atlantis' breach of contract claim, which asks the Court to rule on the meaning of the words "installation" and "use" within the meaning of the Settlement Agreement and Third Amendment, respectively, is procedurally improper because it would not dispose of an entire claim. (Pl. Interpretation Opp. 3.) The Court rejects Atlantis' effort to convince it to ignore the language of the Settlement Agreement and the Third Amendment. The arguments CA advances in its partial summary judgment motion are the same ones it raises in opposition to Atlantis' own motion for partial summary judgment on its breach of contract claim, and the Court would thus consider these arguments regardless of the procedural vehicle used to make them.

installing: the state of being installed 2: something is installed _for use_," Merriam-Webster's Coll. Dict. (10th ed. 2002) (emphasis added). Atlantis' reliance on terms in the SLA and its amendments suggesting that licensing (rather than "use") was the touchstone of the parties' business arrangement is irrelevant in the face of an unambiguous term such as "installation." See, e.g., Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170, 750 N.Y.S.2d 565, 569 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."). Accordingly, CA can only be liable for royalties under the Second Amendment to the extent they arise from unreported licensees or instances where E/NAT was actually installed on its customers' machines.

CA admits that it failed to disclose a relative handful of licensees or installations prior to the Settlement Date, and concedes that it owes Atlantis a corresponding amount of royalties. (Def. Interpretation Br. 7.) Inasmuch as neither party has moved for summary judgment on the amount of CA's outstanding liability, how to calculate the royalties under the Second Amendment for the undisclosed licensees or installations is not before the Court.

B. <u>The Third Amendment</u>

Atlantis claims that CA breached the Third Amendment by not complying with its reporting obligation and by improperly calculating royalty payments during this period. "[S]ummary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." <u>Topps Co., Inc. v. Cadbury Stani S.A.I.C.</u>, 526 F.3d 63, 68 (2d Cir. 2008). An agreement is ambiguous where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." <u>Id.</u>

> "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case."

<u>Id.</u>

1. <u>Calculating Royalties under the Third Amendment</u>

Under the Third Amendment, the issue is whether CA breached its royalty obligations by computing its payments according to its "allocated MIPS" formula. As the Third Amendment does not "convey a definite meaning" as to how royalties should have been calculated for MIPS Licenses during

this period, summary judgment is denied.  See Topps Co., 526 F.3d at 68.

Atlantis maintains that the Third Amendment unambiguously required CA to pay it a percentage of the G1 List Price for every CPU on which customers could have used E/NAT under their licenses. (See Pl. Breach Br. 16-17.)  While this formula applies to Designated-CPU Licenses in a straightforward way, it is not at all clear that this scheme applies to MIPS Licenses.  A MIPS License allowed customers who paid for a bundle of software to use that software on any number of computers, provided that the combined computing power of these machines stayed under an agreed-upon MIPS cap.  In other words, if a customer paid for a MIPS License and had five mainframes, it theoretically could run E/NAT on all five machines as long as the combined computing power of the mainframes did not exceed the MIPS capacity specified in the license.[6]  (See id.)  In Atlantis' view, if CA gave a MIPS License to a customer with five computers, CA was obligated to pay royalties calculated as a percentage of the list price of each machine, regardless of whether E/NAT was ever installed or used on more than one CPU. (Pl. Breach Reply 4 (arguing that "CA did not pay Atlantis [the]

---

[6] As mentioned in the background section, CA asserts that because E/NAT was meant for development work, CA's customers typically used the software on only one of its machines, which was kept segregated from the customers' network.  See supra at 9.

list price for <u>each one</u> of its customers' CPUs that were <u>licensed to use</u> E/NAT.") (emphasis added).)

Atlantis' position is undercut by the Third Amendment's plain language. As discussed earlier, the Third Amendment contained the following two provisions. The first is what the Court will refer to as the "first computer" royalty provision:

> Royalties. For each copy of [E/NAT] distributed by CA to customers, CA shall pay to Atlantis an amount equal to thirty-four percent (34%) of the "G1" list price, which fee shall be inclusive of maintenance for the first one (1) year period after the delivery of [E/NAT] from CA to CA's customer.

(Gaugler Decl. Ex. D at 1.) The second is what the Court will refer to as the "more than one computer" provision:

> In case a client <u>uses</u> the software on more than one (1) MACHINE, the following rules shall be applied:
>
> 1. The largest MACHINE on which the software is installed shall be used to calculate the basic fees (with 34% royalty).
>
> 2. For each additional MACHINE the additional royalties shall be 20% (instead of 34%) of the "G1" list price.

(Gaugler Breach Decl. Ex. D at 2 (emphasis added).) Read together, these provisions strongly suggest that after the first computer, CA would only be liable for royalties to the extent its customers actually used E/NAT on their second, third or

fourth machines. Atlantis' interpretation of the Agreement--
that in the MIPS License scenario, CA was responsible for
royalties for every computer on which its customers <u>could have</u>
<u>used</u> E/NAT--would render meaningless the "more than one
computer" provision. Courts are loathe to interpret a contract
in such a way. <u>See, e.g.</u>, <u>Manley v. AmBase Corp.</u>, 337 F.3d 237,
250 (2d Cir. 2003) (New York law "disfavors interpretations that
render contract provisions meaningless or superfluous").

Atlantis has failed to meet its burden of
demonstrating that the Third Amendment is "wholly unambiguous"
and "convey[s] a definite meaning" with respect to how CA's
royalty obligation is computed when E/NAT is bundled with other
software in a MIPS License. <u>See</u> <u>Topps. Co.</u>, 526 F.3d at 68.
To state the obvious, this decision should not be read to mean
that CA had leave to invent any type of royalty formula it
thought appropriate; rather, Atlantis simply has not proven at
this stage that CA's "allocated MIPS" method violated the
parties' agreement. The Third Amendment does not provide a
clear answer, and Atlantis has not pointed to extrinsic evidence
that sheds any light on the issue. Accordingly, summary
judgment is denied on this aspect of Atlantis' breach of
contract claim.

### 2. CA's Reporting Obligation

Atlantis also maintains that CA breached its reporting obligations under the Third Amendment. (Gaugler Decl. Ex. D, Third Amendment at 3.) It is unclear what, if any, Atlantis' damages were for this alleged breach, particularly in light of its failure to establish as a matter of law how MIPS License royalties should have been calculated under the Third Amendment. Because damages is an element of a breach of contract claim, summary judgment is denied on this point. First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998).

## II. Atlantis' Obligation to Develop Updates

CA argues that Atlantis failed to "enhance and update" E/NAT during the life of the SLA. CA asserts this argument as both a breach of contract counterclaim and as an affirmative defense to Atlantis' breach of contract claim. The "Update Clause" provides in part that Atlantis "shall continuously enhance and update the Product to ensure that the Product supplied to CA will include: . . . (ii) all modifications necessary to support new versions of the CA Software on the MVS Operating Environment." (SLA ¶ 2.4.) CA claims that Atlantis halted development work as early as 2002 and deliberately concealed that fact from CA. (See Def. Update Opp. 1.) Atlantis argues that CA's damages theory is fatally flawed, that CA waived its right to assert its rights under the Update

Clause, and that CA's counterclaim is barred by the Settlement Agreement. (Pl. Update Br. 9, 16, 20.) For the following reasons, this motion is GRNATED IN PART AND DENIED IN PART.

### A. CA's Purported Damages

Atlantis argues CA's flawed damages theory precludes its affirmative defense and counterclaim. "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." First Investors, 152 F.3d at 168 (internal quotation marks omitted). CA's alleged damages are based on restitution premised on a royalty payment and on expectation damages premised on the idea that CA would have ceased paying Atlantis royalties as soon as it learned of the alleged breach and developed a replacement for E/NAT. (Def. Update Opp. 18-19.)

As an initial matter, damages is not a required element of CA's nonperformance affirmative defense. "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007). Whether Atlantis' alleged failure to enhance and update E/NAT

was a "substantial" failure to perform which thereby excused CA's performance under the SLA is a question of fact. Id.

Atlantis also maintains that CA's restitution and damages theories fail, arguing that restitution is unavailable and that CA's damages theory is too speculative as a matter of law. (Pl. Update Br. 9, 14.) The Court addresses each theory in turn.

### 1. Restitution

CA claims that it is entitled to restitution in the amount of royalties it paid to Atlantis after Atlantis halted development on E/NAT. (Def. Update Opp. 16.) The Court agrees with CA that restitution is an available remedy for its breach of contract counterclaim. See Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 729 (2d Cir. 1992) ("Upon a demonstration that a defendant is liable for material breach, the plaintiff may recover the reasonable value of services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by him." (internal quotation marks omitted)) (applying New York law); see also Waxman v. Envipco Pick Up & Processing Serv., Inc., No. 02-CV-10132, 2006 WL 236818, at *4 (S.D.N.Y. Jan. 17, 2006). On a restitution theory, if CA can prove that Atlantis materially breached the SLA by failing to update and enhance E/NAT, CA would be entitled to recover as much of the royalties it paid to Atlantis as it

can show unjustly enriched Atlantis. See Bausch & Lomb, 977 F.2d at 730 ("Following a restitution theory, B&L would be entitled to recover as much of the $500,000 payment it made to Sonomed as it can show unjustly enriched Sonomed."). Because it appears from the record that CA was able to license non-enhanced versions of E/NAT to its customers, it seems likely that CA derived a benefit from the SLA that would foreclose its right to recover all of the money it paid Atlantis; rather, CA may be entitled to recover the amount of the royalties less the value of the benefit CA realized from the agreement.[7] See id.

For the first time in its reply, Atlantis argues that CA's restitution theory fails because CA "has failed to identify or quantify any loss it suffered as a result of [] Atlantis' purported failures to upgrade E/NAT, much less show that the loss was 'material.'" (Pl. Update Reply 2.) The Court does not consider arguments raised for the first time in reply papers, e.g., United States v. Hatfield, __ F. Supp. 2d __, 2011 WL 2446430, at *20 (E.D.N.Y. June 14, 2011), but would nevertheless reject this claim on its merits. CA asserts that customers questioned the pace at which Atlantis was enhancing E/NAT (see Def. Update Opp. 5), and there is evidence suggesting that at

---

[7] CA's position on restitution is consistent with the Court's July 6, 2009 Order, which characterized CA's affirmative defense as an attempt to offset any damages that Atlantis might recover from Atlantis' breach of contract claim. (July 6, 2009 Memorandum & Order at 18.)

least one customer elected not to license E/NAT through CA because E/NAT lacked a certain enhancement. (Miller Decl. Ex. 9.) Atlantis assured CA that this particular enhancement would be available when E/NAT Version 3.0 launched. (Id.)

Whether Atlantis materially breached the SLA and whether and how much Atlantis was unjustly enriched as a result of the breach are issues for trial. Summary judgment is denied on this point; subject to the discussion concerning the release and Settlement Agreement, CA will be permitted to pursue this theory at trial.

### 2. Counterclaim Damages

As an alternative to restitution, CA seeks breach of contract damages premised on the curative steps CA claims it would have taken in 2002 or 2003 had it known that Atlantis had stopped developing updates for E/NAT, namely that it would have developed software comparable to E/NAT and stopped paying Atlantis royalties. (Def. Update Opp. 18-19.) The Court agrees with Atlantis that this theory is too speculative to go forward. Although "[i]t is well-settled under New York law that [t]he rule which proscribes the recovery of uncertain and speculative damages applies where the fact of damages is uncertain, not where the amount is uncertain," the Court thinks that, in this case, the very fact of damages is merely hypothetical. Toporoff

Engineers, P.C. v. Fireman's Fund Ins. Co., 371 F.3d 105, 109

(2d Cir. 2004) (internal quotation marks omitted).

The only evidence CA offers on this theory is the

testimony of its principal product manager, John Dueckman.

Dueckman, CA claims, testified that had CA known the true status

of Atlantis' E/NAT development in 2002 or 2003, it would have

taken the very same steps that it eventually took in 2006 to

replace the software. (Def. Update Br. 18-19.) CA

mischaracterizes its employee's testimony. Dueckman actually

said:

> In preparing for this deposition, as
> well as in the litigation in general, a part
> of what I've been made aware of was the fact
> that the development of E/Net Version 3, for
> all intents and purposes, ceased entirely in
> the years 2002 and 2003.
>
> At CA, we were completely unaware that
> that is, in fact, what had taken place. And
> arguably, we believed in good faith that it
> was still taking place.
>
> Had we known back then, as certainly as
> product manager, one of our job function
> within the company is to ensure that our
> brand maintains market value. So in this
> case, the Endeavor brand carries a very
> large market value and a very strong
> following.
>
> And secondly, one of the things that as
> product managers we have to do is make
> ongoing decisions in terms of our
> marketplace and how to deliver to their
> problems in terms of buy, build, acquire or
> retire.

In 2002, 2000 -- 2002, 2003, obviously, we still believe this was still forthcoming. **Had we known at that time, we would have immediately launched into a process where we would have re-examined whether or not one, do we want to stay in this marketplace, do we want to stay in the natural environment, do we want to acquire someone, or do we want to buy a new solution?**

Because we were without that information from Atlantis, that effort was never launched. And so in good faith, we just continued on, assuming it was going to be coming as per what we felt was part of the partnership.

(Miller Decl. Ex. 1, Dueckman Dep. II 102-104 (emphasis added).) In other words, far from stating unequivocally that CA would have immediately replaced E/NAT with a comparable program, Dueckman testified that had CA known the truth, it would have weighed its options, which included buying the rights to comparable software, acquiring a firm to develop comparable software, or leaving the E/NAT marketplace altogether.

Dueckman's testimony undercuts CA's request that the Court "presume that a contracting party might terminate a bilateral contract and develop a replacement product upon learning of the other's breach." (Def. Update Opp. 19.) This is particularly true because Dueckman testified elsewhere that, even after it learned that Atlantis had halted development on E/NAT, CA's reasons for building a comparable program were to acquire "more latitude in terms of [CA's] being able to offer

pricing and discounting" and to own the software and code "and everything else [so] that we could provide permanent support and maintenance for." (Eric Shimanoff Reply Declaration Ex. A, Dueckman Dep. I 114-15, 182.) Dueckman did not cite E/NAT's stagnant development as a reason for CA's decision to write new software. In short, CA has not pointed to any evidence to show that its theory that it would have begun developing comparable software as soon as it learned of Atlantis' alleged breach is anything more than speculation. Accordingly, Atlantis is entitled to summary judgment on this aspect of CA's counterclaim. See, e.g., West, Weir & Bartel, Inc. v. Mary Carter Paint Co., 25 A.D.2d 81, 86, 267 N.Y.S.2d 29, 34 (1st Dep't 1966) ("The rule is well-established that where it is speculative whether damages were sustained there may be no recovery. The fact of damage must be clearly established.").

B. CA did not Waive its Affirmative Defense or Counterclaim

In light of CA's evidence that Atlantis deceived it into believing that Atlantis was hard at work upgrading E/NAT, Atlantis is not entitled to summary judgment on the basis that CA waived its rights under the Update Clause. See Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 301 A.D.2d 70, 80, 747 N.Y.S.2d 468 (1st Dep't 2002) ([A] party loses an affirmative defense of excuse for breaching a contract only where the party continues to carry out the contract in spite of

a _known_ excuse for nonperformance." (internal quotation marks omitted) (emphasis in _Computer Possibilities_)). "Waiver requires the voluntary an intentional abandonment of a known right," _id._, and CA obviously could not abandon its rights under the Update Clause if Atlantis was actively hiding its breach. See _id._ (quotation marks omitted) (emphasis in _Computer Possibilities_). Here, Atlantis repeatedly reassured CA--as late as November 2005 (Miller Decl. Ex. 9)--that an updated version of E/NAT was nearly ready. In reality, though, Atlantis stopped development work in 2002 or 2003, according to evidence that CA obtained for the first time in 2008. (Gaugler 1/24/08 Dep. 93-94.) This evidence precludes summary judgment.

Atlantis argues that CA waived its Update claims because it continued the parties' relationship despite actual notice of Atlantis' breach (Pl. Update Br. 16.) This argument stems from the flawed premise that CA necessarily knew Atlantis breached the Update Clause as soon as CA rolled out new Endevor functionality that Atlantis failed to match with enhancements to E/NAT. (See Pl. Update Br. 5, 18.) Because E/NAT did not keep pace with Endevor's "Application Programming Interface" that was released in July 1998, for example, Atlantis argues that CA knew about Atlantis' breach from that moment forward.

Atlantis' argument ignores both the SLA's plain language and the evidence in the record. The Update Clause

required Atlantis to "<u>continuously</u> enhance and update" E/NAT. (SLA ¶ 2.4 (emphasis added).) This language suggests that the parties understood that developing the required enhancements would be an ongoing process and that advancements in E/NAT would not necessarily keep the exact pace as advancements in CA's software. By the terms of the contract, Atlantis was under a continuing obligation to develop updates for E/NAT and there is evidence that Atlantis deceived CA into believing that it was fulfilling its responsibilities.

C. <u>The Release does not Completely bar CA's Counterclaim</u>

Atlantis' argument that the Settlement Agreement bars CA's counterclaim is based on the same faulty premise as its waiver argument. (<u>See</u> Pl. Update Br. 20.) Because Atlantis owed a continuing duty to update and enhance E/NAT, CA's claim is not wholly precluded by the December 10, 2004 Settlement Agreement. Rather, as CA suggests, the Settlement Agreement only bars CA from recovering damages that it incurred prior to that the settlement date. (<u>See</u> Def. Update Opp. 20.)

In a footnote, CA suggests that the Settlement Agreement does not prevent it from asserting its affirmative defense against Atlantis' Second Amendment claims. (Def. Update Opp. 20.) As discussed above, Atlantis may only assert those Second Amendment royalty claims to the extent that they arise from undisclosed licensees or installations. CA concedes that

it owes royalties for a handful of undisclosed licensees or installations. (See Def. Interpretation Br. 7.) CA may not invoke the affirmative defense as a basis for reducing these royalties. See Pickwick Comm. v. Weinberg, No. 91-CV-1642, 1994 U.S. Dist. LEXIS 15680, at *42 (S.D.N.Y. Nov. 1, 1994).

III. Atlantis' Motion to Preclude CA's Expert

In a letter motion (Docket Entry 156), Atlantis seeks to preclude testimony from Dieter Storr ("Storr"), a software specialist who examined the E/NAT source code for CA during discovery. In its summary judgment briefing, CA submitted a declaration in which Storr testified that he "saw no evidence" that Atlantis performed development work on E/NAT since approximately 2002. (See Dieter Storr Declaration ¶¶ 7-18.) Storr did not submit an expert report, and Atlantis seeks to preclude his testimony pursuant to Federal Rule of Civil Procedure 37(c)(1). CA counters that (1) Storr is not testifying as an expert; and (2) even if he were, Atlantis has not been prejudiced by CA's failure to submit an expert report. The Court flatly rejects CA's argument that Storr is not offering expert testimony. Storr's characterizing that E/NAT's source code evidenced no signs of development is patently "technical[] or other specialized knowledge." FED. R. CIV. P. 702; see also United States v. Ganier, 468 F.3d 920, 926 (6th Cir. 2006) (proposed testimony about forensic software falls

31

under Evidence Rule 702); cf. United States v. Wilson, 408 Fed.
Appx. 798, 808 (5th Cir. 2010) (witness' testimony concerning
search of email inboxes was lay, not expert, testimony).

The issue, then is whether preclusion is warranted
under Federal Rule 37.  Preclusion is a drastic remedy; to
determine whether it is appropriate here the Court considers the
following factors: "(1) [CA's] explanation for its failure to
comply with the relevant scheduling Orders; (2) the importance
of [Storr's] expert testimony; (3) the prejudice suffered by
[Atlantis] as a result of having to prepare to meet the new
testimony; and (4) the possibility of a continuance."  See Exo-
Pro, Inc. v. Seirus Innovative Accessories, Inc., No. 05-CV-
3629, WL 4878513, at *2-3 (E.D.N.Y. Feb. 19, 2008) (citing
Softel, Inc. v. Dragon Med. & Scientific Comm., Inc., 118 F.3d
955, 961 (2d Cir 1997)).  Having considered these factors, the
Court finds that preclusion is warranted.  CA has not offered a
convincing explanation for its failure to submit an expert
report.  It had six months between when it learned of the
computer files and the deadline to submit an expert report.
(Docket Entry 156.)  Storr did not even examine the files until
after the deadline for expert reports had passed.  (Id.)  To the
Court's knowledge, CA has not submitted an expert report to
date, and to permit Storr to testify at trial would require the
Court to re-open expert discovery to include Storr's deposition

and time for Atlantis to submit a rebuttal expert report. Atlantis would be prejudiced by having to meet Storr's evidence at this late stage, and it would force the Court to delay an already five-year-old case, cf. id. at *4 (declining to preclude an expert witness where there was time to cure the moving party's prejudice before trial).

## CONCLUSION

For the foregoing reasons, Atlantis' motion for partial summary judgment on the liability aspect of its breach of contract claim (Docket Entry 113) is DENIED. Its motion for summary judgment on CA's affirmative defense (Docket Entry 108) is GRANTED IN PART AND DENIED IN PART. Specifically, it is granted as to CA's theory that it would have begun developing software similar to E/NAT as soon as it learned of Atlantis' alleged breach. It is also granted to the extent that it seeks to prevent CA from asserting its affirmative defense or counterclaims for the period prior to the date of the Settlement Agreement. It is denied in all other respects. CA's motion for partial summary judgment as to the meanings of "install" and "use" (Docket Entry 118) is DENIED AS MOOT inasmuch as the Court ruled on these issues in the context of Atlantis' motion for partial summary judgment on its breach of contract claim. Atlantis' letter motion to preclude further testimony of Dieter

Storr (Docket Entry 156) is GRANTED.  CA is precluded from

offering Storr's testimony at trial.


                              SO ORDERED.


                              /s/ JOANNA SEYBERT_____
                              Joanna Seybert, U.S.D.J.

Dated:     September __28__, 2011
           Central Islip, New York